Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JUSTIN LANFAIR, derivatively on behalf of C3.AI, INC., <br><br> Plaintiff, <br><br> v. <br><br> THOMAS M. SIEBEL, EDWARD Y. ABBO, DAVID BARTER, LORENZO SIMONELLI, PATRICIA A. HOUSE, RICHARD LEVIN, MICHAEL G. MCCAFFERY, S. SHANKAR SASTRY, BRUCE SEWELL, JIM H. SNABE, STEPHEN M. WARD JR., HOUMAN BEHZADI, BRUCE CLEVELAND, and BRADY MICKELSEN, <br><br> Defendants, <br><br> and <br><br> C3.AI, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br><br><br><br><br> **DEMAND FOR JURY TRIAL** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## INTRODUCTION

Plaintiff Justin Lanfair ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant C3.ai, Inc. ("C3" or the "Company") files this Verified Shareholder Derivative Complaint against Defendants Thomas M. Siebel ("Siebel"), Edward Y. Abbo ("Abbo"), David Barter ("Barter"), Lorenzo Simonelli ("Simonelli"), Patricia A. House ("House"), Richard Levin ("Levin"), Michael G. McCaffery ("McCaffery"), S. Shankar Sastry ("Sastry"), Bruce Sewell ("Sewell"), Jim H. Snabe ("Snabe"), Stephen M. Ward Jr. ("Ward"), Houman Behzadi ("Behzadi"), Bruce Cleveland ("Cleveland"), and Brady Mickelsen ("Mickelsen"), (collectively, the "Individual Defendants", and together with C3, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors and/or officers of C3, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding C3, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the directors, officers, and controlling shareholders of C3 from December 9, 2020 through February 16, 2022, both dates inclusive (the "Relevant Period").

2.      Artificial Intelligence ("AI") allows computers to perform tasks that previously required human reasoning, including speech recognition, decision-making, visual perception, and language translation. AI software also can analyze large data sets quickly, locating patterns or anomalies that a human would find quite difficult to locate by themselves.

3.      "Enterprise" AI software applies AI methods, including machine learning and neural networks, to reduce production costs, streamline supply chain management, assist management of inventory, or detect fraud, among other things.

4.      In 2009, Defendant Siebel founded C3 with the purported purpose of designing AI algorithms intended to automate and accelerate certain tasks for use by enterprise organizations and businesses across a variety of industries, including the financial, manufacturing, defense, intelligence, aerospace, healthcare, telecommunications, industrial, and energy sectors.

5.      According to the Company's public filings, C3 offers several products, including: (1) the C3 AI Platform, an end-to-end platform for developing, deploying, and operating Enterprise AI applications; (2) C3 AI Applications, a portfolio of industry-specific software-as-a-service ("SaaS"); (3) Enterprise AI applications that enable the digital transformation of organizations globally; and (4) C3 Generative AI, a suite of large AI transformer models for enterprise.

6.      These products are meant to aid organizations and businesses in simplifying and accelerating Enterprise AI application development, deployment, and administration. For example, C3's AI Software platform helps developers to quickly build applications by using conceptual models of all the elements required by an Enterprise AI application instead of having to write complex, lengthy, structured programming code to define, control, and integrate the many requisite data and microservices components to work together. In other words, C3 works to make use of AI software more efficient and accessible for businesses.

7.     C3 purports to enjoy strategic partnerships with leaders in several of the aforementioned industry sectors, especially with energy Baker Hughes—one of the world's biggest oil field services companies—in the energy sector. As a company who sells products and services to supplement and improve other businesses, C3's success is highly reliant on the Company's ability to sell its products and services, including AI software subscriptions, to other businesses. This requires C3's sales department to expend tremendous resources. Additionally, about 30 percent of C3's total revenue stems from a joint venture with energy company Baker Hughes.

8.     For this reason, and until December 1, 2021, C3 maintained that the Company had access to and was leveraging Baker Hughes' extensive marketing, sales, and services resources, including Baker Hughes' "12,000-person sales organization."

9.     However, this was not true. Contrary to the Individual Defendants' representations, the Company did not enjoy access to Baker Hughes' actual, robust salesforce. Rather, C3 and Baker Hughes designed an entirely new salesforce to handle selling C3's products and services, separate and apart from Baker Hughes' own established team ("Baker Hughes C3 Salesforce"). Making matters worse, the Baker Hughes C3 Salesforce was composed of salespeople who did not have the industry expertise and robust network that Baker Hughes' traditional salesforce team had. Consequently, Baker Hughes C3 Salesforce did not make any sales during the fiscal year ended April 30, 2020 (the "2020 Fiscal Year")[1].

10.     On November 13, 2020, the Individual Defendants filed the Registration Statement with the SEC in connection with C3's initial public offering ("IPO").

11.     On December 8, 2020 the SEC declared the Registration Statement effective

---

[1] C3's fiscal year does not mirror the calendar year but rather begins on May 1st and concludes on April 30th of each calendar year. For the period between May 1, 2022 and April 30, 2023 (the "2023 Fiscal Year"), for the period between May 1, 2021 and April 30, 2022 (the "2022 Fiscal Year"), for the period between May 1, 2020 and April 30, 2021 (the "2021 Fiscal Year").

and the Company priced the stock at $42 per share. The following day, the Company filed the final Prospectus with the SEC for the IPO (collectively with the Registration Statement, the "Offering Documents") and C3's common stock began trading on the NYSE under the ticker "AI."

12.    Pursuant to the IPO, the Individual Defendants entered a 180-day lockup period, restricting them from selling Company common stock acquired through the IPO. However, the Registration Statement included an exception to the 180-day lockup period which stated that the Individual Defendants could make initial stock sales after just 90 days if the following requirements were met: (1) the sales constituted less than 20% of the Individual Defendants' overall stock ownership; (2) the Company had issued a quarterly earnings release announced by press release through a major news service or on a report on Form 8-K; and (3) the last reported closing price of C3's Class A common stock was at least 33% more than the IPO price of the Class A common stock for ten out of any fifteen consecutive trading days, including the last day, ending on or after March 8, 2021, or the Early Release. Further, if March 8, 2021 occurred within five trading days of a trading black-out period, the above-referenced early expiration period would be the sixth trading day immediately preceding the commencement of the trading black-out period.

13.    Many of the Individual Defendants took great advantage of this 90-day exception, immediately and immensely profiting from the Company's common stock being artificially inflated as a result of their materially false and misleading statements. Ten of the Individual Defendants—Siebel, Abbo, Barter, Simonelli, House, Levin, Sewell, Ward, Behzadi, and Cleveland—all made insider sales on March 8, 2021, the first eligible trading day after the 90-day lockup period. Collectively, from that lone day of trading, their profits exceeded *$254.5 million*.[2] In total, during the Relevant Period, the Individual Defendants personally profited by a staggering *$745 million*.

14.    The truth began to emerge on December 1, 2021, during an earnings

---

[2] All emphasis is added unless otherwise noted.

conference call, when Defendant Siebel revealed that the Company had reorganized and revamped its direct salesforce months earlier, in July 2021, and had to reorganize it again during the last month of the second quarter of 2021.

15.     That same day, the Company also revealed that it had "significantly expanded and restructured its strategic relationship with Baker Hughes for the second time… The newly expanded contract also introduced a new pricing model and selling structure designed to further accelerate sales of C3 AI software products into the Baker Hughes customer base." However, the Individual Defendants did not reveal this information on their own, but rather revealed the truth only after an analyst inquired as to the reason why C3 engaged in the restructurings. In his answer, Defendant Siebel revealed that the Company and Baker Hughes created the Baker Hughes C3 Salesforce to sell C3's products and services in the energy industry, instead of tasking Baker Hughes' already existing 12,000-person expert salesforce as C3 had previously represented.

16.     On this news, the price of the Company's common stock fell $3.79 per share, or approximately 11.20%, from its closing price of $33.83 per share on December 2, 2021, to close at $30.04 per share on December 3, 2021.

17.     The truth fully emerged over two months later on February 16, 2022, when Spruce Point Capital Management ("Spruce Point") published a report on C3 that urged investors to sell their holdings of the Company (the "Spruce Point Report").

18.     The Spruce Point Report revealed that C3's thrice restructured partnership with Baker Hughes, C3's largest customer by sales (constituting about thirty percent of all C3 sales in the 2021 Fiscal Year), supported the Company's sales through minimum guarantees.

19.     However, a former C3 employee depicted the partnership as "a marriage that is not working." For instance, when the joint venture agreement between the Company and Baker Hughes was amended for the third time on October 31, 2021, the remaining minimum revenue commitment for the 2022 Fiscal Year was removed and Baker Hughes'

peak revenue commitment was reduced and delayed until the 2025 fiscal year. The third amendment also featured other difficult provisions for the Company, including price discounts to prospective customers.

20.    Further, the Spruce Point Report questioned whether the partnership between Baker Hughes and C3 would continue after the current agreement ended. The Spruce Point Report also revealed that C3 was paying Baker Hughes $25 million in sales commissions on what Spruce Point determined to be a maximum of $11 million of eligible revenues for commission payments. Making matters worse, the Company agreed to pay the lucrative commissions despite the Baker Hughes joint venture not being on track to hit the minimum revenue requirement for the 2022 Fiscal Year.

21.    Additionally, the Spruce Point Report revealed that, contrary to the Individual Defendants' statements during the December 1, 2021 earnings conference call, the third amendment to the joint venture between C3 and Baker Hughes would reduce the net cash commitments made to C3 from Baker Hughes. The Spruce Point Report also revealed that other highly touted partnerships with companies like Google, Microsoft, AWS, and Intel either were not as significant as C3 had represented or had not expanded to the level C3 had stated publicly. For instance, sales agents from Hewlett Packard and Microsoft were not familiar with C3's name and did not attempt to sell Spruce Point employees any C3 products or services. Additionally, despite C3's representations about its "strategic alliance with Google Cloud," Spruce Point revealed that C3 was not even mentioned as a "Featured Partner Solution" on Google Cloud's AI and machine learning website.

22.    The Spruce Point Report also revealed that, during the IPO process, C3 materially inflated its TAM from $170 billion to $271 billion. In the Offering Documents, C3 stated that C3's market would grow to $271 billion by 2024. In C3's September 2020 prospectus, however, just two months before the IPO, C3 represented that the Company catered to "a large and rapidly growing market, estimated to be $106 billion in 2020, growing to $170 billion in 2024."

23.     Lastly, the Spruce Point Report revealed the Company suffered from significant turnover issues, involving employees from the sales teams all the way to the Chief Financial Officer ("CFO"). The Spruce Point Report stressed that C3 had three CFOs at the Company since the start of the Company's IPO process in September 2020. Specifically, the Spruce Report emphasized that Defendant Barter resigned after just 14 months with C3, forfeiting more than 900,000 unvested options—a package worth about $20 million. The Spruce Report noted that a former C3 employee stated they had four different bosses in six months, stating that "attrition is a real problem."

24.     On this news, the Company's stock price fell $1.01 per share, or 3.9%, from its closing price of $25.71 per share on February 15, 2021 to close at $24.70 per share on February 16, 2022.

25.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of the Company. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) C3's Baker Hughes partnership was falling apart; (2) C3 experiencing largescale turnover in its salesforce; (3) C3's total addressable market (TAM) figures, market growth projections, and relationships with major businesses were patently unrealistic and unattainable; and (4) C3 failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

26.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

27.     At the same time, twelve of the Individual Defendants—Siebel, House, Levin, McCaffery, Sewell, Ward, Abbo, Behzadi, Cleveland, Mickelsen, Barter, and Sinonelli,

and non-party Company director Condoleezza Rice ("Director Rice") profited by over *$751 million* from improper insider sales, which were undertaken with knowledge of non-public information while the Company's stock price was artificially inflated due to the aforementioned misrepresentations. Making matters worse, several of the improper sales occurred just after the 90-day exception to the lock up period expired.

28.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

29.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

30.    The Individual Defendants' misconduct has subjected the Company, its Chief Executive Officer ("CEO"), its Chairman of the Board, its President, its former CFO, its Chief Technology Officer ("CTO"), and a former Company director to being named defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action").

31.    Moreover, the Company must undertake internal investigations and needs to implement adequate internal controls over its financial reporting.

32.    Due to the Individual Defendants' breaches of fiduciary duties, the Company has and will be forced to expend millions of dollars.

33.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, of the collective engagement in fraud and misconduct by the Company's directors, of their being beholden to one another and to various of the Individual Defendants, of their receipt of material personal benefits as a result of the Individual Defendants' misconduct, of the substantial likelihood of the directors' liability in this derivative action and of Defendants Siebel's, Abbo's, Barter's, and Simonelli's, liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of

disinterestedness and independence.

## JURISDICTION AND VENUE

34.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder.

35.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

36.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

37.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

38.    The court has personal jurisdiction over each Defendant because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she has, directly or indirectly, used the means and instrumentalities of interstate commerce, some of which are, the mails, interstate telephone communications, and the facilities of the national securities markets.

39.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

40.    Plaintiff Lanfair is a current shareholder of C3. Plaintiff purchased Company common stock on December 22, 2020 and has continuously held C3 common stock since that time.

**Nominal Defendant C3**

41.   C3 is a Delaware corporation with its principal executive offices at 1400 Seaport Blvd, Redwood City, CA, 94063. C3's common stock trades on the NYSE under the ticker symbol "AI."

**Defendant Siebel**

42.   Defendant Siebel has served as a Company director, Chairman, and the Company's CEO since 2009. According to the Company's proxy statement filed on Schedule 14A with the SEC on August 24, 2023 (the "2023 Proxy Statement"), as of August 8, 2023, Defendant Siebel beneficially owned 33,651,531 shares of the Company's common stock. His Company stock ownership includes 29,578,711 shares of Class A common stock and 3,072,820 shares of Class B common stock, representing 55.5% of the Company's outstanding common stock, thus making Defendant Siebel a controlling shareholder of the Company. Given that the price per share of the Company's common stock at the close of trading on August 8, 2023 was $35.99, Defendant Siebel owned approximately $1.2 billion worth of C3 stock as of that date.

43.   For the 2023 Fiscal Year, Defendant Siebel received $31,712,200 in total compensation from the Company, including $1,000,000 in salary, $29,540,333 in stock awards, $1,000,000 in non-equity incentive plan compensation, and $171,867 in all other compensation. For the 2022 Fiscal Year, Defendant Siebel received $26,865,979 in total compensation from the Company, including $5,524 in salary, $2,000,000 in bonuses, $24,701,889 in option awards, and $158,566 in all other compensation. For the 2021 Fiscal Year, Defendant Siebel received $29,797,431 in total compensation from the Company, including $5,646 in salary, $29,791,785 in option awards.

44.   During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Siebel made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 8, 2021 | 2,263,241 | $ 84.82 | $191,957,307 |
| March 15, 2021 | 1,138,024 | $84.01 | $95,605,800 |
| June 7, 2021 | 1,294,356 | $62.42 | $80,791,078 |
| June 10, 2021 | 705,644 | $58.96 | $41,604,976 |
| June 14, 2021 | 680,909 | $ 59.39 | $40,440,348 |
| July 13, 2021 | 667,291 | $53.65 | $35,803,283 |
| August 16, 2021 | 653,945 | $46.22 | $30,224,071 |
| September 13, 2021 | 640,866 | $49.13 | $31,485,574 |
| October 13, 2021 | 484,149 | $46.17 | $22,352,186 |
| November 15, 2021 | 615,488 | $48.36 | $29,762,880 |

Thus, in total, before the fraud was exposed, he sold 9,143,913 shares of Company stock on inside information, for which he received approximately $600 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

45.    The 2023 Proxy Statement stated the following about Defendant Siebel:

*Thomas M. Siebel.* Mr. Siebel is the founder of our company and has served as the Chairman of our board of directors since January 2009, and as our Chief Executive Officer since July 2011. Prior to founding our company, Mr. Siebel founded and served as the Chief Executive Officer of Siebel Systems, a global CRM software company. Siebel Systems merged with Oracle Corporation in January 2006. Mr. Siebel served in various leadership positions with Oracle Corporation from January 1984 to September 1990. Mr. Siebel currently serves as a member of the College of Engineering boards at the University of Illinois at Urbana-Champaign and the University of California, Berkeley. He

was elected a member of the American Academy of Arts and Sciences in April 2013. Mr. Siebel holds a B.A. in History, an M.B.A., and an M.S. in Computer Science, each from the University of Illinois at Urbana-Champaign. He is the author of four books, including most recently the best-selling Digital Transformation: Survive and Thrive in an Era of Mass Extinction (RosettaBooks, 2019).

**Defendant House**

46.     Defendant House served as a Company director from September 2009 until February 24, 2023. Defenant House also served as a member of the Compensation Committee. According to the Company's Schedule 14A filed with the SEC on August 24, 2022 (the "2022 Proxy Statement"), as of August 9, 2022, Defendant House beneficially owned 1,081,599 shares of the Company's Class A common stock, and 500,000 shares of the Company's Class B common stock, representing 14.3% of the Company's outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on August 9, 2022 was $21.35, Defendant House owned approximately $33.7 million worth of C3 stock as of that date.

47.     For the 2023 Fiscal Year, Defendant House received $369,995 in compensation from the Company, consisting entirely of $369,995 in option awards. For the 2022 Fiscal Year, Defendant House received $359,948 in compensation from the Company, consisting entirely of $359,948 in option awards. For the 2021 Fiscal Year, Defendant House received $731,110 in compensation from the Company, consisting entirely of $731,110 in option awards.

48.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant House made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| March 8, 2021 | 237,940 | $85.93 | $20,447,135 |

| September 10, 2021 | 100,000 | $50.66 | $5,066,000 |
| September 23, 2021 | 46,000 | $49.50 | $2,277,000 |

Thus, in total, before the fraud was exposed, she sold 383,940 shares of Company stock on inside information, for which she received approximately $27.8 million in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

49.   The 2023 Proxy Statement stated the following about Defendant House:

*Patricia A. House*. Ms. House is a co-founder of our company and has served as the Vice Chairman of our board of directors since September 2009. Until it merged with Oracle Corporation in January 2006, Ms. House served as a co-founder of Siebel Systems, a global CRM software company, and held various leadership positions, most recently as Executive Vice President. Ms. House has served on the board of directors of The William and Flora Hewlett Foundation since March 2011 and on the board of directors of the Carnegie Endowment for International Peace since October 2010. She also previously served on the board of directors of Levi Strauss & Co. from July 2003 until November 2007. Ms. House holds a B.A. in Education from Western Michigan University.

**Defendant Levin**

50.   Defendant Levin has served as a Company director since August 2010. He is also a member of the Audit Committee. According to the 2023 Proxy Statement, as of August 8, 2023, Defendant Levin beneficially owned 465,968 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on August 8, 2023 was $35.99, Defendant Levin owned approximately $16.7 million worth of C3 stock as of that date.

51.   For the 2023 Fiscal Year, Defendant Levin received $349,996 in compensation from the Company, consisting entirely of $349,996 in option awards. For the 2022 Fiscal Year, Defendant Levin received $340,489 in compensation from the Company, consisting entirely of $340,489 in option awards. For the 2021 Fiscal Year, Defendant Levin received $487,139 in compensation from the Company, consisting entirely of $487,139 in option awards.

52.   During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Levin made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 8, 2021 | 69,261 | $89.05 | $6,167,345 |
| March 10, 2021 | 6,713 | $89.00 | $597,457 |
| June 17, 2021 | 9,000 | $60.00 | $540,000 |
| June 22, 2021 | 10,000 | $60.16 | $601,600 |

Thus, in total, before the fraud was exposed, he sold 94,974 shares of Company stock on inside information, for which he received approximately $7.9 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

53.   The 2023 Proxy Statement stated the following about Defendant Levin:

*Richard C. Levin*. Dr. Levin has served as a member of our board of directors since August 2010. Since June 2017, Dr. Levin has served as a Senior Advisor to Coursera Inc., an online learning platform company, for which Dr. Levin served as the Chief Executive Officer from April 2014 until June 2017. Prior to his roles at Coursera, Dr. Levin served as President of Yale University from July 1993 to June 2013. Dr. Levin served as a director of American Express Co. from January 2007 to May 2019. Dr. Levin is currently a Fellow of the

American Academy of Arts and Sciences and the American Philosophical Society and is a former trustee of The William and Flora Hewlett Foundation. Dr. Levin also served as an advisor on President Obama's Council of Advisors on Science and Technology. Dr. Levin holds a B.A. in History from Stanford University, a B.Litt. in Politics from Oxford University, and a Ph.D. in Economics from Yale University.

**Defendant McCaffery**

54.     Defendant McCaffery served as the Company's Lead Independent director since March 2009. He is also the Chairman of the Audit Committee and a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of August 8, 2023, Defendant McCaffery beneficially owned 1,269,349 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on August 8, 2023 was $35.99, Defendant McCaffery owned approximately $45.6 million worth of C3 stock as of that date.

55.     For the 2023 Fiscal Year, Defendant McCaffery received $414,999 in compensation from the Company, including $414,999 in option awards. For the 2022 Fiscal Year, Defendant McCaffery received $403,724 in compensation from the Company, consisting entirely of $403,724 in option awards. For the 2021 Fiscal year, Defendant McCaffery received $974,273 in compensation from the Company, consisting entirely of $974,273 in option awards.

56.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant McCaffrey made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 15, 2021 | 189,483 | $87.90 | $16,655,176 |

Thus, in total, before the fraud was exposed, he sold 189,483 shares of Company stock on inside information, for which he received approximately $16.7 million in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

57.    The 2023 Proxy Statement stated the following about Defendant McCaffery:

*Michael G. McCaffery*. Mr. McCaffery has served as a member of our board of directors since March 2009. Since December 2005, Mr. McCaffery has served as the Managing Director for Makena Capital Management, LLC, an investment management firm, and was Chief Executive Officer of Makena Capital Management, LLC from December 2005 to January 2013. Since February 2015, Mr. McCaffery has also served on the board of directors for NVIDIA Corporation, a technology company. Mr. McCaffery holds a B.A. from the Woodrow Wilson School of Public and International Affairs at Princeton University, a B.A. Honours and an M.A. in Politics, Philosophy and Economics from Merton College at Oxford University as a Rhodes Scholar, and an M.B.A. from the Stanford Graduate School of Business

**Defendant Sastry**

58.    Defendant Sastry served as a Company director from January 2009 to February 27, 2023.  According to the 2022 Proxy Statement, as of August 9, 2022, Defendant Sastry beneficially owned 612,137 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on August 9, 2022 was $21.35, Defendant Sastry owned approximately $13 million worth of C3 stock as of that date.

59.    For the 2023 Fiscal Year, Defendant Sastry received $349,996 in compensation from the Company, consisting entirely of $349,996 in option awards. For the 2022 Fiscal Year, Defendant Sastry received $340,489 in compensation from the Company, including $340,489 in option awards. For the 2021 Fiscal Year, Defendant Sastry received $487,139 in compensation from the Company, including $487,139 in option awards.

60.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Sastry made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| April 14, 2021 | 50,000 | $69.22 | $3,461,000 |

Thus, in total, before the fraud was exposed, he sold 50,000 shares of Company stock on inside information, for which he received approximately $3.5 million in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

61.    The 2023 Proxy Statement stated the following about Defendant Sastry:

*S. Shankar Sastry*. Dr. Sastry has served as a member of our board of directors since January 2009. Dr. Sastry has served in a number of roles with the University of California, Berkeley, including as the Thomas M. Siebel Professor of Computer Science since January 2019, the director of the Blum Center for Developing Economies since February 2007, and the co-director of the C3.ai Digital Transformation Institute since March 2020. He also served as the Dean and Roy W. Carlson Professor of Engineering from July 2007 to June 2018 and as Chairman, Department of Electrical Engineering and Computer Sciences, University of California, Berkeley from January 2001 through June 2004. From October 2004 to July 2007, Dr. Sastry served the Director of the Center for Information Technology in the Interests of Society, an interdisciplinary center spanning the University of California, Berkeley, Davis, Merced and Santa Cruz. From November 1999 to March 2001, he was the Director of the Information Technology Office at the Defense Advanced Research Projects Agency. He was elected to the National Academy of Engineering in 2001 and the American Academy of Arts and Sciences in 2004, and elected as a Fellow of IEEE in 1994, and International Federation of Automatic Control Fellow in 2016. Dr. Sastry received the President of India Gold Medal in 1977, the IBM Faculty Development in 1983, and the NSF U.S. Presidential Young Investigator Award in 1985. In 1990, he received the Eckman Award of the American Automatic Control Council, and

in 2005, he received the Ragazzini Award for Distinguished Accomplishments in teaching. Dr. Sastry also received the distinguished Alumnus Award of the Indian Institute of Technology in 1999, the Distinguished Alumnus of the International House at the University of California, Berkeley, and the David Marr prize for the best paper at the International Conference in Computer Vision in 1999. Dr. Sastry holds a B.Tech. from the Indian Institute of Technology, Bombay and an M.S. in Electrical Engineering and Computer Science, an M.A. in Mathematics and a Ph.D. in Electrical Engineering and Computer Sciences each from the University of California, Berkeley.

**Defendant Sewell**

62.     Defendant Sewell has served as a Company director since May 2017. He is also the Chair of the Nominating and Corporate Governance Committee and a member of the Compensation Committee. According to the 2023 Proxy Statement, as of August 8, 2023, Defendant Sewell beneficially owned 670,223 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on August 8, 2023 was $35.99, Defendant Sewell owned approximately $24.1 million worth of C3 stock as of that date.

63.     For the 2023 Fiscal Year, Defendant Sewell received $369,995 in compensation from the Company, consisting entirely of $369,995 in option awards. For the 2022 Fiscal Year, Defendant Sewell received $359,948 in compensation from the Company, consisting entirely of $359,948 in option awards. For the 2021 Fiscal Year, Defendant Sewell received $1,836,767 in compensation from the Company, consisting entirely of $1,836,767 in option awards.

64.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Sewell made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| March 8, 2021 | 34,986 | $88.56 | $3,098,465 |

Thus, in total, before the fraud was exposed, he sold 34,986 shares of Company stock on inside information, for which he received approximately $3.1 million in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

65.    The 2023 Proxy Statement stated the following about Defendant Sewell:

*Bruce Sewell*. Mr. Sewell has served as a member of our board of directors since May 2017. Mr. Sewell served as the Senior Vice President, General Counsel and Secretary of Apple Inc., a technology company, from September 2009 to December 2017. From October 1996 to September 2009, Mr. Sewell served in various leadership positions with Intel Corporation, including as Senior Vice President, General Counsel from September 2002 to September 2009. Since January 2013, Mr. Sewell has served on the board of directors for Vail Resorts, Inc., a mountain resort company. Mr. Sewell holds a B.S. from Lancaster University (U.K.) and a J.D. from The George Washington University Law School.

**Defendant Snabe**

66.    Defendant Snabe has served as a Company director since February 2021. According to the 2023 Proxy Statement, as of August 8, 2023, Defendant Snabe beneficially owned 688,849 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on August 8, 2023 was $35.99, Defendant Snabe owned approximately $24.8 million worth of C3 stock as of that date.

67.    For the 2023 Fiscal Year, Defendant Snabe received $349,996 in compensation from the Company, consisting entirely of $349,996 in option awards. For the 2022 Fiscal Year, Defendant Snabe received $340,489 in compensation from the Company, consisting entirely of $340,849 in option awards. For the 2021 Fiscal Year, Defendant Snabe received $3,529,665 in compensation from the Company, consisting entirely of $3,529,665 in option awards.

68.    The 2023 Proxy Statement stated the following about Defendant Snabe:

*Jim H. Snabe*. Mr. Snabe has served as a member of our board of directors since February 2021. From September 2020 to February 2021, he served as a senior advisor to our Chief Executive Officer. Mr. Snabe served as Co-Chief Executive Officer of SAP AG, a technology company, from February 2010 to May 2014, and as a member of the SAP AG supervisory board from May 2014 to May 2018. Mr. Snabe currently serves as Chairman of the Supervisory Board of Siemens AG, an industrial technology company. Mr. Snabe served as Vice Chairman of the Supervisory Board of Allianz SE, an insurance and financial asset management company, from 2014 to May 2022, and Chairman of the Board of A.P. Møller – Mærsk A/S, a shipping and transportation company, from 2014 to March 2022. Mr. Snabe also currently serves as a member of the Board of Trustees of the World Economic Forum, a non-profit organization.

**Defendant Ward**

69.    Defendant Ward served as a Company director since January 2009. He is also Chair of the Compensation Committee and a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of August 8, 2023, Defendant Ward beneficially owned 946,780 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on August 8, 2023 was $35.99, Defendant Ward owned approximately $34 million worth of C3 stock as of that date.

70.    For the 2023 Fiscal Year, Defendant Ward received $369,995 in compensation from the Company, consisting entirely of $369,995 in option awards. For the 2022 Fiscal Year, Defendant Ward received $359,948 in compensation from the Company, consisting entirely of $359,948 in option awards. For the 2021 Fiscal Year, Defendant Ward received $3,529,665 in compensation from the Company, consisting entirely of $3,529,665 in option awards.

71.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Ward made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 8, 2021 | 5,000 | $91.37 | $456,850 |
| March 9, 2021 | 146,461 | $86.14 | $12,615,418 |
| March 10, 2021 | 11,000 | $86.86 | $955,427 |
| July 1, 2021 | 20,000 | $63.20 | $1,264,000 |

Thus, in total, before the fraud was exposed, he sold 182,461 shares of Company stock on inside information, for which he received approximately $15.3 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

72.     The Proxy Statement stated the following about Defendant Ward:

*Stephen M. Ward, Jr.* Mr. Ward has served as a member of our board of directors since January 2009. Mr. Ward served as the Chief Executive Officer for Lenovo Group Limited, the international personal computer company formed by the acquisition of IBM's personal computer division by Lenovo, from April 2005 to January 2006. Prior to that acquisition, Mr. Ward held a number of management positions with IBM from September 1978 to April 2005, including Senior Vice President and General Manager of the Personal Systems and Retail Systems Group from March 2003 to April 2005, General Manager of the Industrial Sector from February 2000 to March 2003, General Manager of the Thinkpad and Mobile division from January 1998 to March 2000 and Chief Information Officer from February 1997 to March 2000. Mr. Ward has served on the board of directors of Carpenter Technology Corporation, a specialty metals company, since March 2001. He has also served on the board of directors of Molekule, an air purification, monitoring equipment and software company, since November 2022. From July 2021 until its sale to LM Ericsson Telephone Company in July 2022, Mr. Ward served as a member of the board of directors of Vonage Holdings Corp., an

internet communications company. From December 2014 until its sale to The Boeing Company in October 2018, Mr. Ward served as a member the board of directors of KLX Inc., an aerospace solutions and supply chain company, and from September 2018 to June 2021, he served as a member of the board of directors of KLX Energy Services Holdings, Inc., an oilfield services company spun out from KLX Inc. Mr. Ward also previously served as a member of the board of directors of E2Open, a supply chain SAS company he co-founded, from January 2001 to March 2015, E-Ink Corporation, a maker of electronic paper displays, from December 2006 to December 2009 and QD Vision, Inc., a nanomaterials product company, from June 2014 until its sale to Samsung in November 2016. Mr. Ward holds a B.S. in Mechanical Engineering from California Polytechnic State University, San Luis Obispo.

**Defendant Abbo**

73.    Defendant Abbo served as a Company director from August 2009 to November 2020, and the Company's Chief Executive Officer from September 2009 to July 2011. Defendant Abbo has served as the Company's Chief Technology Officer since July 2011.

74.    According to the 2023 Proxy Statement, as of August 8, 2023, Defendant Abbo beneficially owned 1,770,338 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on Augst 8, 2023 was $35.99, Defendant Abbo owned approximately 63.7 million worth of C3 stock as of that date.

75.    For the 2023 Fiscal Year, Defendant Abbo received $29,930,119 in total compensation from the Company, including $550,000 in salary, $28,827,437 in stock awards, $550,000 in non-equity incentive plan compensation, and $2,682 in all other compensation. For the 2022 Fiscal Year, Defendant Abbo received $32,264,347 in total compensation from the Company, including $550,000 in salary, $4,581,825 in stock awards, $26,629,090 in option awards, $500,000 in non-equity incentive plan compensation, and $3,432 in all other compensation. For the 2021 Fiscal Year, Defendant Abbo received $1,598,438 in total compensation from the Company, including $550,000

in salary, $898,438 in option awards, and $150,000 in non-equity incentive plan compensation.

76.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Abbo made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 8, 2021 | 258,717 | $86.09 | $22,273,937 |
| March 11, 2021 | 83,236 | $86.65 | $7,212,588 |
| June 17, 2021 | 86,768 | $59.28 | $5,143,462 |
| July 15, 2021 | 86,768 | $51.69 | $4,485,221 |
| August 19, 2021 | 34,707 | $44.96 | $1,560,343 |
| September 16, 2021 | 34,707 | $50.30 | $1,745,683 |
| October 21, 2021 | 34,707 | $47.65 | $1,653,714 |
| November 18, 2021 | 23,138 | $43.44 | $1,005,070 |

Thus, in total, before the fraud was exposed, he sold 642,748 shares of Company stock on inside information, for which he received approximately $45 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

77.     The 2023 Proxy Statement stated the following about Defendant Abbo:

*Edward Y. Abbo*. Mr. Abbo has served as our Chief Technology Officer since July 2011. He previously served as our Chief Executive Officer from September 2009 to July 2011 and a member of our board of directors from August 2009 to November 2020. Prior to joining us, Mr. Abbo served as Senior Vice President of Engineering and Chief Technology Officer for Siebel

Systems from July 1994 until it merged with Oracle Corporation in January 2006, and Senior Vice President of Oracle Corporation from January 2006 to July 2009. Mr. Abbo holds a B.S. in Mechanical and Aerospace Engineering from Princeton University and an M.S. in Mechanical Engineering from the Massachusetts Institute of Technology.

### Defendant Barter

78.     Defendant Barter served as the Company's Senior Vice President and Chief Financial Officer from October 8, 2020 to December 11, 2021.

79.     For the 2022 Fiscal Year, Defendant Barter received $250,602 in compensation from the Company, including $245,455 in salary, and $5,147 in all other compensation. For the 2021 Fiscal Year, Defendant Barter received $9,114,252 in compensation from the company, including $223,398 in salary, $100,000 in bonus, $8,674,187 in option awards, and $116,667 in non-equity inventive plan compensation.

80.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Barter made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| October 12, 2021 | 170,333 | $45.04 | $7,671,798 |
| November 12, 2021 | 14,844 | $46.29 | $687,075 |

Thus, in total, before the fraud was exposed, he sold 185,177 shares of Company stock on inside information, for which he received approximately $8.3 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

81.    A press release published by Business Wire[3] on August 4, 2022 stated the following about Defendant Barter:

Barter brings nearly three decades of high-growth public and private company finance experience to New Relic. Most recently, Barter served as CFO of C3 AI, where he led the company through a successful IPO. Previously, he held the CFO position at Model N and led finance teams at Microsoft, General Electric, and Guidewire Software. Barter is an established business leader with proven success leading the financial strategies of public companies in the technology sector. He holds a Master of Business Administration and Master of Engineering Management from Northwestern University's Kellogg School of Management, and a Bachelor of Business Administration in Finance and Philosophy from University of Notre Dame.

**Defendant Behzadi**

82.    Defendant Behzadi served as the Company's Chief Product Officer from October 2016 until June 19, 2023, when he transitioned to his current role as Executive Vice President. Defendant Behzadi previously served as Senior Vice President and Chief Product Officer from October 2016 to July 2020, Senior Vice President of Products and Engineering from July 2012 to October 2016, and Vice President of Engineering from January 2010 to July 2012. According to the 2023 Proxy Statement, as of August 8, 2023, Defendant Behzadi beneficially owned 721,731 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on August 8, 2023 was $35.99, Defendant Behzadi owned approximately $25.9 million worth of C3 stock as of that date.

83.    For the 2023 Fiscal Year, Defendant Behzadi received $29,928,427 in compensation from the Company, including $550,000 in salary, $28,827,437 in stock awards, $550,000 in non-equity incentive plan compensation, and $990 in all other compensation. For the 2022 Fiscal Year, Defendant Behzadi received $31,962,565 in compensation from the Company, including $500,000 in salary, $4,581,825 in stock

---

[3] Article titled "New Relic Announces David Barter as Chief Financial Officer"

awards, $26,629,090 in option awards, $250,000 in non-equity incentive plan compensation, and $1,650 in all other compensation.

84.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Behzadi made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| March 8, 2021 | 50,000 | $87.93 | $4,396,550 |
| March 9, 2021 | 50,000 | $86.12 | $4,306,250 |
| March 10, 2021 | 97,839 | $86.61 | $8,473,444 |
| June 8, 2021 | 70,000 | $63.21 | $4,424,980 |
| July 9, 2021 | 70,000 | $58.38 | $4,086,600 |
| August 16, 2021 | 15,887 | $47.39 | $752,837 |
| September 1, 2021 | 15,887 | $53.91 | $856,420 |
| September 10, 2021 | 30,000 | $50.95 | $1,528,350 |
| October 4, 2021 | 15,887 | $44.48 | $706,701 |
| October 11, 2021 | 30,000 | $44.68 | $1,340,400 |
| November 15, 2021 | 15,887 | $49.84 | $791,887 |

Thus, in total, before the fraud was exposed, he sold 461,387 shares of Company stock on inside information, for which he received approximately $31.7 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

85.    The 2023 Proxy Statement stated the following about Defendant Behzadi:

*Houman Behzadi*. Mr. Behzadi has served as our Chief Product Officer since October 2016. Mr. Behzadi previously served as our Senior Vice President and Chief Product Officer from October 2016 to July 2020, our Senior Vice President of Products and Engineering from July 2012 to October 2016, and our Vice President of Engineering from January 2010 to July 2012. Prior to joining us, Mr. Behzadi held various leadership roles with Siebel Systems from January 2001 until it merged with Oracle Corporation in January 2006, and then served as Director, Application Development at Oracle Corporation from January 2006 to January 2010. Mr. Behzadi holds a B.A. in Economics from the University of California, Santa Barbara.

**Defendant Cleveland**

86.    Defendant Cleveland served as the Company's Chief Marketing Officer from November 2019 until October 2021. Defendant Cleveland also served as an advisor to the Company since January 2009.

87.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Cleveland made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 8, 2021 | 64,949 | $88.48 | $5,746,817 |
| September 17, 2021 | 10,000 | $50.63 | $506,350 |

Thus, in total, before the fraud was exposed, he sold 74,949 shares of Company stock on inside information, for which he received approximately $6.3 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

88.    The Company's schedule 14A filed with the SEC on August 20, 2021 (the

"2021 Proxy Statement") stated the following about Defendant Cleveland:

*Bruce Cleveland*. Mr. Cleveland has served as our Senior Vice President and Chief Marketing Officer since November 2019. Mr. Cleveland previously served as an Advisor to our company from January 2009 to November 2019. From January 2016 to November 2019, Mr. Cleveland served as a General Partner of Wildcat Venture Partners, an early-stage venture capital firm. From June 2006 to December 2015, Mr. Cleveland served as Venture Partner and then a General Partner for InterWest Partners, a diversified venture capital firm. Mr. Cleveland held various leadership roles, including Senior Vice President and General Manager of Marketing, with Siebel Systems from April 1996 until it merged with Oracle Corporation in January 2006. Mr. Cleveland holds a B.S. in Business Administration from California State University, Sacramento.

**Defendant Mickelsen**

89.     Defendant Mickelsen served as General Counsel from August 2019 until November 2021 and then as an advisor to the Company.

90.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Mickelsen made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| March 10, 2021 | 10,000 | $88.51 | $885,100 |

Thus, in total, before the fraud was exposed, he sold 10,000 shares of Company stock on inside information, for which he received approximately $885,100 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

91.     The 2021 Proxy Statement stated the following about Defendant Mickelsen:

*Brady Mickelsen*. Mr. Mickelsen has served as our Senior Vice President and General Counsel since August 2019. Prior to joining us, Mr. Mickelsen was

Senior Vice President and Chief Legal Officer for TriNet Group, Inc., an HR solutions company, from June 2015 to November 2018. From October 2010 to June 2015, Mr. Mickelsen served as a partner at White & Case LLP, a global law firm. From March 2005 to October 2010, Mr. Mickelsen held various roles in the legal department at Oracle Corporation, most recently as Vice President & Associate General Counsel. Mr. Mickelsen holds a B.A. in Public Policy from Stanford University and a J.D. from the University of Chicago Law School.

**Defendant Simonelli**

92.     Defendant Simonelli served as a Company director from August 2019 until December 17, 2021.  He currently serves as the Chairman, President, and CEO of Baker Hughes.

93.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Simonelli made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 7, 2021 | 873,431 | $64.25 | $56,117,095 |
| April 9, 2021 | 189,188 | $60.86 | $11,513,887 |
| April 22, 2021 | 170,000 | $67.99 | $11,557,841 |

Thus, in total, before the fraud was exposed, he sold 1,232,619 shares of Company stock on inside information, for which he received approximately $79 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

94.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of C3 and because of their ability to control the business and corporate affairs of C3, the Individual Defendants owed C3 and its shareholders fiduciary obligations

of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage C3 in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of C3 and its shareholders so as to benefit all shareholders equally.

95.     Each controlling shareholder, director and officer of the Company owes to C3 and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

96.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors and/or officers of C3, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

97.     To discharge their duties, the controlling shareholder, officers and directors of C3 were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

98.     Each Individual Defendant, by virtue of their position as a controlling shareholder, director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of C3, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

99.     As senior executive officers and/or directors of a publicly-traded company

whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants, including Defendant Siebel as a controlling shareholder, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

100.  To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of C3 were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California, Delaware, and the United States, and pursuant to C3's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how C3 conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of

the business and internal affairs of C3 and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that C3's operations would comply with all applicable laws and C3's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

101.   Each of the Individual Defendants further owed to C3 and the shareholders the duty of loyalty requiring that each favor C3's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

102.   At all times relevant hereto, the Individual Defendants were the agents of each other and of C3 and were at all times acting within the course and scope of such agency.

103.   Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with C3, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

104.   The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts

complained of herein, as well as the contents of the various public statements issued by C3.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

105.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

106.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets.

107.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and Individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is or was a director of C3 was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

108.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

109.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of C3 and was at all times acting within the course and scope of such agency.

## THE COMPANY'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### C3's Code of Business Conduct and Ethics

110.   C3's Code of Business Conduct and Ethics (the "C3 Code") guides all employees, officers, and directors. The C3 Code states "conduct that is dishonest, unethical, illegal or unsafe is not tolerated at C3.ai." The C3 Code further states:

> Any employee who violates the standards in this Code of Business Conduct and Ethics (this "Code") may be subject to disciplinary action, that, depending on the nature of the violation and the history of the employee, may range from a warning or reprimand to termination of employment and, in appropriate cases, civil legal action or referral for criminal prosecution.

111.   Under the heading "Honest and Ethical Conduct," the C3 Code states:

> It is our policy to promote high standards of integrity by conducting our affairs in an honest and ethical manner. C3's integrity and reputation depend on the fairness and integrity brought to the job by each person associated with us. Personal integrity and sound judgment is the foundation of C3's corporate integrity.

112.   In a section titled "Legal Compliance," the C3 Code states:

> We expect employees, officers and directors to understand the legal and regulatory requirements applicable to their business units and areas of responsibility and to be familiar with and comply with other C3 policies relating to legal compliance, including C3's Anti-Corruption Policy and Insider Trading Policy.

113.   Regarding "Conflicts of Interest," the C3 Code provides, in relevant part:

> C3 expects its employees, officers and directors to be free from influences that conflict with the best interests of C3 or might deprive C3 of their undivided loyalty in business dealings. Making judgments, taking decisions, or pursuing actions when facing a conflict of interest may make it difficult to perform

duties objectively and effectively and may have legal or regulatory consequences. Employees, officers and directors should avoid situations where their personal interests (financial or otherwise) may conflict with or compromise C3's interest, could potentially result in a conflict of interest or could otherwise have the appearance of impropriety.

114.   Regarding "Insider Trading," the C3 Code provides:

Employees, officers and directors who have access to material, non-public (or "inside") information are not permitted to use or share that information for stock trading purposes. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is illegal. Please refer to C3's Insider Trading Policy for more detailed information.

115.   Regarding "Financial Integrity," the C3 Code states:

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others. We also rely upon our accounting and other business and corporate records in preparing publicly-filed reports. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is complete, accurate and transparent.  If you have any concerns about how to comply with this policy, or if you observe conduct or actions that do not seem to comply with this policy, you should immediately discuss such concerns with the General Counsel.

116.   Regarding "Questions and Reporting Potential Violations," the C3 Code provides, in relevant part:

If you are aware of a suspected or actual violation of this Code, you have a responsibility to promptly report it to the General Counsel.

117.   Under the heading "Waivers," the C3 Code states:

Any waiver of this Code for executive officers or directors may be authorized only by our Board of Directors or, to the extent permitted by the rules of any stock exchange on which our capital stock is listed and our Corporate Governance Guidelines, a committee of the Board of Directors and will be disclosed to stockholders as required by applicable laws, rules and regulations.

118.   In violation of the C3 Code, the Individual Defendants (as controlling shareholders, key officers, and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including, but not limited to, breaches of fiduciary duty, gross mismanagement, unjust enrichment, waste of corporate assets, and abuse of control. Moreover, twelve of the Individual Defendants violated the C3 Code by engaging in insider trading. In violation of the C3 Code, the Individual Defendants consciously disregarded their duties to comply with the applicable laws and regulations, engage in fair dealing, avoid using corporate opportunities for personal gain, avoid conflicts of interest, appropriately maintain the Company's books, records, accounts, and financial statements, and make accurate filings with the SEC.

### C3's Audit Committee Charter

119.   C3's Audit Committee Charter opens with stating the purpose of the Audit Committee is to:

- Oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;

- Oversee the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors");

- Maintain and foster an open avenue of communication with the Company's management, and Auditors;

- Review any reports or disclosures required by applicable law and stock exchange listing requirements;

- Help the Board oversee the Company's legal and regulatory compliance, including risk assessment; and

- Provide regular reports and information to the Board.

120. The Audit Committee Charter also describes the Audit Committee's responsibilities. The Audit Committee Charter states that the Audit Committee responsibilities are for "oversight."

121. In a section titled "Financial Review and Disclosure," the Audit Committee Charter states:

The Committee will review with management and the Auditors the results of the Company's annual financial statement audit, including:

- the Auditors' assessment of the quality of the Company's accounting principles and practices;

- the Auditors' views about qualitative aspects of the Company's significant accounting practices and the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative GAAP methods on the financial statements);

- all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial);

- the adequacy of the disclosures in the financial statements; and

- any other matters that the Auditors must communicate to the Committee under applicable accounting or auditing standards.

122.    In a section titled "Audited Financial Statement Review; Quarterly and Annual Reports," the Audit Committee Charter states:

> The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

123.    Regarding the Company's "Accounting Principles and Policies," the Audit Committer Charter provides:

> The Committee will review and discuss with management and the Auditors significant issues regarding accounting principles and financial-statement presentation, including:
>
>    • critical accounting policies and practices;
>
>    • alternative accounting policies available under GAAP;
>
>    • the potential impact on the Company's financial statements of alternative treatments and any off-balance sheet structures; and
>
>    • any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on the Company's financial statements, compliance programs, and policies.

124.    Regarding the Company's "Internal Control and Procedures" the Audit Committer Charter provides a section on "Risk Assessment and Management" and states, in relevant part:

> The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

by the Company, including but not limited to information security, competition, and regulation.

125. Regarding the Company's "Internal Control over Financial Reporting; Disclosure Controls," the Audit Committer Charter provides:

> The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and, to the extent necessary, any remediation plans or special audit steps adopted in light of any material control deficiencies.

126. Regarding the Company's "Ethical Compliance," the Audit Committee Charter provides:

> The Committee will review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure compliance with applicable laws and stock exchange listing requirements, including the Company's Code of Business Conduct and Ethics (the "Code").

### C3's Corporate Governance Guidelines

127. In a section titled "Board Responsibilities", the Corporate Governance Guidelines states, in relevant part:

> A director should discharge his or her duties, including duties as a member of any committee on which he or she serves, in good faith and in a manner the director reasonably believes to be in the best interests of the Company and its stockholders. Board members will comply with the laws and requirements of the Exchange and other applicable regulatory agencies and with all policies and guidelines of the Company, including without limitation, the Company's Code of Business Conduct and Ethics.

128. In violation of the C3 Code, the C3 Audit Committee Charter, and the Corporate Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading

statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and the aiding and abetting thereof. Also, in violation of C3's corporate governance documents, the Individual Defendants failed to maintain the accuracy of C3 records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the C3 Code. Furthermore, the Individual Defendants failed to maintain internal controls.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background on "Enterprise" Artificial Intelligence

129. Artificial Intelligence, or AI, allows computers to perform tasks that previously required human reasoning, including speech recognition, decision-making, visual perception, and language translation. AI software also can analyze large data sets quickly, locating patterns or anomalies that a human would find quite difficult to locate by themselves.

130. "Enterprise" AI software applies AI methods, including machine learning and neural networks, to reduce production costs, streamline supply chain management, assist management of inventory, or detect fraud, among other things.

### Background on C3

131. In 2009, Defendant Siebel founded C3 with the purported purpose of designing AI algorithms intended to automate and accelerate certain tasks for use by enterprise organizations and businesses across a variety of industries, including the financial, manufacturing, defense, intelligence, aerospace, healthcare, telecommunications, industrial, and energy sectors.

132. According to the Company's public filings, C3 offers several products, including: (1) the C3 AI Platform, an end-to-end platform for developing, deploying, and operating Enterprise AI applications; (2) C3 AI Applications, a portfolio of industry-

specific software-as-a-service (SaaS); (3) Enterprise AI applications that enable the digital transformation of organizations globally; and (4) C3 Generative AI, a suite of large AI transformer models for enterprise.

133.   These products are meant to aid organizations and businesses in simplifying and accelerating Enterprise AI application development, deployment, and administration. For example, C3's AI Software platform helps developers to quickly build applications by using conceptual models of all the elements required by an Enterprise AI application instead of having to write complex, lengthy, structured programming code to define, control, and integrate the many requisite data and microservices components to work together. In other words, C3 works to make use of AI software more efficient and accessible for businesses.

134.   C3 purports to enjoy strategic partnerships with leaders in several of the aforementioned industry sectors, especially with energy Baker Hughes—one of the world's biggest oil field services companies—in the energy sector. As a company who sells products and services to supplement and improve other businesses, C3's success is highly reliant on the Company's ability to sell its products and services, including AI software subscriptions, to other businesses. This requires C3's sales department to expend tremendous resources. Additionally, about 30 percent of C3's total revenue stems from a joint venture with energy company Baker Hughes.

135.   For this reason, and until December 1, 2021, C3 maintained that the Company had access to and was leveraging Baker Hughes' extensive marketing, sales, and services resources, including Baker Hughes' "12,000-person sales organization."

136.   However, this was not true. Contrary to the Individual Defendants' representations, the Company did not enjoy access to Baker Hughes' actual, robust salesforce. Rather, C3 and Baker Hughes designed an entirely new salesforce to handle selling C3's products and services, separate and apart from the Baker Hughes C3 Salesforce. Making matters worse, the Baker Hughes C3 Salesforce was composed of

salespeople who did not have the industry expertise and robust network that Baker Hughes' traditional salesforce team had. Consequently, Baker Hughes C3 Salesforce did not make any sales during the 2020 Fiscal Year.

### *The IPO*

137.   On November 13, 2020, the Individual Defendants filed the Registration Statement with the SEC in connection with C3's IPO.

138.   On December 8, 2020 the SEC declared the Registration Statement effective and the Company priced the stock at $42 per share. The following day, the Company filed the final Prospectus with the SEC for the IPO and C3's common stock began trading on the NYSE under the ticker "AI."

139.   Pursuant to the IPO, the Individual Defendants entered into a 180-day lockup period, restricting them from selling Company common stock acquired through the IPO. However, the Registration Statement included an exception to the 180-day lockup period which stated that the Individual Defendants could make initial stock sales after just 90 days if the following requirements were met: (1) the sales constituted less than 20% of the Individual Defendants' overall stock ownership; (2) the Company had issued a quarterly earnings release announced by press release through a major news service or on a report on Form 8-K; and (3) the last reported closing price of C3's Class A common stock was at least 33% more than the IPO price of the Class A common stock for ten out of any fifteen consecutive trading days, including the last day, ending on or after March 8, 2021, or the Early Release. Further, if March 8, 2021 occurred within five trading days of a trading black-out period, the above-referenced early expiration period would be the sixth trading day immediately preceding the commencement of the trading black-out period.

140.   Many of the Individual Defendants took great advantage of this 90-day exception, immediately and immensely profiting from the Company's common stock being artificially inflated as a result of their materially false and misleading statements. Ten of the Individual Defendants—Siebel, Abbo, Barter, Simonelli, House, Levin, Sewell, Ward,

Behzadi, and Cleveland—all made insider sales on March 8, 2021, the first eligible trading day after the 90-day lockup period. Collectively, from that lone day of trading, their profits exceeded *$254.5 million*. In total, during the Relevant Period, the Individual Defendants personally profited by a staggering *$745 million*.

141.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of the Company. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) C3's Baker Hughes partnership was falling apart; (2) C3 experiencing largescale turnover in its salesforce; (3) C3's total addressable market (TAM) figures, market growth projections, and relationships with major businesses were patently unrealistic and unattainable; and (4) C3 failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**<u>False and Misleading Statements</u>**

***The Offering Documents***

142.    The Offering Documents, filed in connection with C3's IPO, contained false and misleading statements regarding C3's salesforce size, the nature of the Company's strategic partnerships, especially the relationship between the Company and Baker Hughes, and C3's "Go-to-Market Strategy" business model as it became a publicly traded company.

143.    The Offering Documents stated the following in their discussion of an overview of C3, including the Company's purported "Extensive Partner Ecosystem" and "Sales Alliances," among other things:

**Extensive Partner Ecosystem**

We have established strategic relationships with technology leaders including AWS, Baker Hughes, Fidelity National Information Services, or FIS, Google,

IBM, Microsoft, and Raytheon. These world-leading technology companies can marshal tens of thousands of talented resources to establish and serve small, medium, and large C3.ai customer relationships at global scale.

\* \* \*

**Sales Alliances**

Strategic partnerships are core to our growth strategy with market-leading companies offering highly leveraged distribution channels to various markets.

To date, we have established such a partnership with Baker Hughes to address the needs of the global oil and gas market, with FIS to address needs in the financial services market, with Raytheon to serve the U.S. defense and intelligence communities, and with Microsoft and Adobe to address the next generation of CRM.

In addition, we have announced global alliances with AWS, IBM, Intel, and Microsoft to jointly market, sell, and service our combined solutions across industry verticals.

In the majority of our sales opportunities we are aligned with one or more of these partners.

144.   The Offering Documents stated the following about C3's "Go-to-Market Strategy":

Our go-to-market strategy is focused on large organizations recognized as leaders in their respective industries or public sectors, and who are attempting to solve complicated business problems by digitally transforming their operations. These large organizations, or lighthouse customers, include companies and public agencies within the oil and gas, power and utilities, aerospace and defense, industrial products, and financial services industries, among others. This has resulted in C3.ai powering some of the largest and most complex Enterprise AI applications worldwide. ***These lighthouse customers serve as proof points for other potential customers in their particular industries. Today, we have a customer base of a relatively small number of large organizations that generate high average total subscription contract value, but we expect that, over time, as more customers adopt our technology based on the proof points provided by these lighthouse customers, the revenue represented by these customers will decrease as a***

***percentage of total revenue***. As our AI Suite is industry agnostic, we also expect to expand into other industries as we grow. For example, for the fiscal year ended April 30, 2018, revenue from customers in the financial services, oil and gas, aerospace and defense, manufacturing, and utilities industries represented 0%, 1%, 3%, 29%, and 67% of our total revenue, respectively, and in the six months ended October 31, 2020, revenue from these customers represented 10%, 30%, 16%, 20%, and 25% of our total revenue, respectively.

\* \* \*

The size and sophistication of our customers' businesses demonstrate the flexibility, speed, and scale of our products, and maximize the potential value to our customers. To be a credible partner to our customers, who often are industry leaders, we deploy a motivated and highly educated team of C3 personnel and partners. ***We go-to market primarily leveraging our direct sales force, and during the fiscal year ended April 30, 2020, we substantially increased the number of direct sales resources. We also complement and supplement our sales force with a number of go-to-market partners***.

- *Strategic Vertical Industry Partners.* We have developed an alliance program to partner with recognized leaders in their respective industries, such as Baker Hughes, Fidelity National Information Services, or FIS, and Raytheon, to develop, market, and sell solutions that are natively built on or tightly integrated with the C3 AI Suite.

- *Consulting and Service Partners*. As part of a global industry alliance, we partner with IBM Global Services, as well as a number of systems integrators specializing in Enterprise AI implementations.

- *Hyperscale Cloud and Infrastructure*. We have formed global strategic goto market alliances with hyperscale cloud providers including Amazon, FIS, Google, and Microsoft. In addition, we have strategic alliances with leading hardware infrastructure providers to deliver our software optimized for their technology.

These partners include Hewlett Packard Enterprise, and Intel. These partners supply infrastructure solutions, data management and processing services, or hardware and networking devices (e.g. IoT gateways) to support C3.ai product implementations and complement C3.ai's products.

\* \* \*

***In addition to the activities of our field sales organization, our success in attracting new customers will depend on our ability to expand our ecosystem of strategic partners and the number of industry verticals that they serve. Our strategic go-to-market alliances vastly extend our reach globally. Some of our most notable partners include Baker Hughes, FIS, IBM, and Microsoft. Each strategic partner is a leader in its industry, with a substantial installed customer base and extensive marketing, sales, and services resources that we can leverage to engage and serve customers anywhere in the world.*** Using our AI Suite as the development suite, we leverage our model-driven architecture to efficiently build new cross-industry and industry-specific applications based on identifying requirements across our customer base of industry leaders and through our industry partners. Our strategy with strategic partners is to establish a significant use case and prove the value of our AI Suite with a flagship customer in each industry in which we participate. We have done this with our strategic vertical industry partner in oil and gas, Baker Hughes, as well as with our iconic global customers, some of whom are deploying C3.ai technology to optimize thousands of critical assets globally across their upstream, midstream, and downstream operations. We establish formal sales and marketing plans with each partner, including specific sales goals and dedicated budgets, and we work closely with these partners to identify specific target accounts. We intend to grow the business we do with each partner and to add more partners as we expand the vertical markets we serve. We also offer revenue generating trials of our applications as part of our customer acquisition strategy.

In June 2019, we entered into a three-year arrangement with Baker Hughes as both a leading customer and as a partner in the oil and gas industry. This arrangement included a subscription to our AI Suite for their own operations (which we refer to below as direct subscription fees), the exclusive right for Baker Hughes to resell our offerings worldwide in the oil and gas industry, and the non-exclusive right to resell our offerings in other industries. Under the arrangement, Baker Hughes made minimum, non-cancelable, total revenue commitments to us of $50.0 million, $100.0 million, and $170.0 million, which are inclusive of their direct subscription fees of $39.5 million per year, for each of the fiscal years ending April 30, 2020, 2021, and 2022, respectively, with the remainder to be generated from the resale of our solutions by the Baker Hughes sales organization.

During the fiscal year ended April 30, 2020, we recognized as revenue the full value of the first year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement. This

arrangement was revised in June 2020 to extend the term by an additional two years, for a total of five years, with an expiration date in the fiscal year ending April 30, 2024 and to modify the annual amount of Baker Hughes' commitments to $53.3 million $75.0 million, $125.0 million, and $150.0 million, which are inclusive of their revised direct subscription fees of $27.2 million per year over the fiscal years ending April 30, 2021, 2022, 2023, and 2024, respectively. Any shortfalls against the total annual revenue commitment made to us by Baker Hughes will be assessed and recorded by us at the end of the fourth quarter of each fiscal year. We are obligated to pay Baker Hughes a sales commission on subscriptions to our products and services offerings it resells in excess of these minimum revenue commitments.

Our RPO related to Baker Hughes, which includes both direct subscriptions and reseller arrangements, is comprised of $19.9 million related to deferred revenue and $20.0 million from non-cancellable contracts as of April 30, 2019, $2.4 million related to deferred revenue and $84.8 million from non-cancellable contracts as of April 30, 2020, and $16.9 million related to deferred revenue and $91.9 million of commitments from noncancellable contracts as of October 31, 2020.

As of July 31, 2019, October 31, 2019, January 31, 2020, April 30, 2020, July 31, 2020, and October 31, 2020 the total remaining amount of Baker Hughes minimum revenue commitments not yet contracted under the direct subscription fee or reseller arrangement, and thus subject to the shortfall annual provisions, under the entire arrangement was $194.0 million, $195.0 million, $190.3 million, $183.8 million, $270.9 million, and $249.9 million, respectively.

145.   The Offering Documents represented that C3's Total Addressable Market, or TAM, was "estimated to be $174 billion in 2020" and would be "growing to $271 billion in 2024":

**Large Total Addressable Market**

We serve a large and rapidly growing market*, **estimated to be $174 billion in 2020, growing to $271 billion in 2024**, based on IDC and Gartner reports.*

Our total addressable market, or TAM, comprises multiple enterprise software segments that are growing at a combined compound annual growth rate, or CAGR, of 12%:

- *Enterprise AI Software*. According to IDC, the relatively new but rapidly growing global Enterprise AI software market totaled $18 billion in 2020, and will grow to $44 billion in 2024—a 24% CAGR. We address this market with our AI Suite and full portfolio of AI Applications.

- *Enterprise Infrastructure Software*. The C3 AI Suite replaces a wide range of existing enterprise infrastructure software categories, including Application Development, Application Infrastructure and Middleware, Data Integration Tools and Data Quality Tools, and Master Data Management Products. According to Gartner, the size of the infrastructure software market across these four segments totaled $63 billion in 2020, and will grow to $82 billion in 2024—a 7% CAGR.

- *Enterprise Applications*. C3 AI Applications address a wide range of Analytics and Business Intelligence use cases as well as the Customer Experience and Relationship Management (CRM) segment. According to Gartner, the size of the software market across these segments totaled $93 billion in 2020, and will grow to $145 billion in 2024—a 12% CAGR. C3.ai is an active participant in the Enterprise AI/ML, Data Analytics, Cloud Computing, and Digital Transformation markets. According to IDC, by 2022, 65% of CIOs will digitally empower and enable front-line workers with data, AI, and security and by 2025, 80% of CIOs alongside lines-ofbusiness will implement intelligent capabilities to sense, learn, and predict changing customer behaviors.

146.   The Offering Documents also boasted about C3's "extensive partner ecosystem," stating the following, in relevant part:

We have established strategic relationships with technology leaders including Amazon Web Services, or AWS, Baker Hughes, Fidelity National Information Services, or FIS, Google, IBM, Microsoft, and Raytheon. These world-leading technology companies can marshal tens of thousands of talented resources to establish and serve small, medium, and large C3.ai customer relationships at global scale.

We form go-to-market and product co-development alliances with our partners that combine our AI expertise and technology with our partners' deep domain expertise to bring next-generation C3.ai solutions to joint customers.

Our partnerships include strategic alliance across four categories:

- *Industry Partners*. Each industry partnership focuses on a key vertical. We have formed global strategic alliances in the energy industry with Francebased global energy leader ENGIE (also a customer); in oil and gas with Baker Hughes, a global leader in oilfield services (also a customer); and in financial services with FIS, leading technology provider to the global financial services industry; and in the U.S. Federal and aerospace sectors with Raytheon, one of the world's largest aerospace and defense manufacturers.

- *Hyperscale Cloud and Infrastructure Partners*. We have formed global strategic go-to-market alliances with hyperscale cloud providers including Amazon, Microsoft, and Google. In addition, we have strategic alliances with leading hardware infrastructure providers to deliver our software optimized for their technology. These partners include Hewlett Packard Enterprise and Intel.

- *Consulting and Services*. We have formed a global strategic go-to-market alliance with IBM Global Business Services, who employs more than 100,000 service professionals. We have also established partnerships with select specialized systems integrators that provide application design and development, data engineering, data science, and systems integration services, including Aubay, BGP, CMC, Data Reply, Infoedge Technology, Informatica El Corte Ingles, Intelia, Neal Analytics, Ortec, Pariveda, SCAP, and Synechron. These alliances are focused on helping organizations accelerate their Enterprise AI and digital transformation programs.

- *Independent Software Vendors*. Our ISV partners develop, market, and sell application solutions that are natively built on or tightly integrated with the C3 AI Suite. The C3 AI Suite enables ISVs to deliver AI capabilities to their installed user base that enhance or complement existing ISV application functionality. As of September 20, ISV partners include ENGIE, FIS, and Ortec.

### *KeyBanc Emerging Technology Summit*

147. On February 24, 2021, Defendant Siebel spoke at the KeyBanc Emerging Technology Summit, emphasizing C3's building of "vertical markets sales organizations,"

including the Company's relationship with Baker Hughes,  stating, in relevant part:

> So the distribution model looks like geographically we're applying major account groups, enterprise groups, middle market groups and mass market groups. This is what we are doing with this capital that we raised to the markets. And then *we are building vertical markets sales organizations for financial services, manufacturing, aerospace, health, telco, utilities and oil and gas*. You see that we have made a number in each of these we're aligned with –we're aligning with a market partner, for example, in oil and gas we go to market with Baker Hughes. *Baker Hughes has 12,000 people selling for us around the world into virtually every oil and gas company on the planet in for a safe energy*, clean energy, sustainability we go to market with ENGIE on Paris.
>
> In financial services, we've formed an alliance with FIS, that is both selling our products and replatforming their products on our – using the C3 AI suite in telco – excuse me, in defense, and intel – intelligence communities we go to market with Raytheon. We'll be announcing – in the next few weeks a new relationship in manufacturing. And then you can expect we will be forming a large relationship with in health and telecommunications. We have a very significant partnership with Microsoft, and AWS, and we go to market with Google and IBM and Intel, Nvidia is a large partner.
>
> And so how does this work? So, this for example, if we're calling on Bank of America this will be my group in New York working with my financial services group, working FIS, partnering with IBM to make Bank of America successful. This would be Royal Dutch Shell, well (00:20:51) out of Amsterdam working with my sales and marketing group working with Baker Hughes, working with Microsoft to make them successful. So, that's the model. *And so, we're working towards – couple of years ago we had 16 sales teams and these – our sales teams are growing, we have 12,000 people at Baker Hughes*, tens of thousands of people at Microsoft. Thousands of people at FIS, more to follow, but we can see that the vision is across all geographies and all indices through these partnerships to have tens to hundreds of thousands of people standardizing on this technology stack and serving customers.

148.   Later during the KeyBanc Emerging Technology Summit, Defendant Siebel was asked about the value of C3's Baker Hughes partnership and partnerships with other

companies in other verticals. Defendant Siebel replied:

> They're useful, they're invaluable, and they're core to the strategy. Let's think about Baker Hughes. So, Baker Hughes is one of the three large oil and gas service providers, the other two being of course Halliburton and Schlumberger. Okay. We have partnered exclusively with Baker Hughes where they've agreed they're going to build all of their software solutions on the C3 AI Suite. This replaces with the previous stack that they brought over from GE. Okay. ***So, Baker Hughes – this partnership – in partnership with Baker Hughes, we have 12,000 people selling every day into the oil and gas industry. Come on, for a company like us to get 12,000 people.***

### March 1, 2021 Press Release

149.   On March 1, 2021, the Company issued a press release announcing C3's financial results for the third quarter of the 2021 Fiscal Year ("3Q 2021 Press Release"). The 3Q 2021 Press Release stated, in relevant part:

> We continue to establish our leadership as the only enterprise AI software pure play," said CEO Thomas M. Siebel. "This is a large and rapidly growing market; we continue to innovate; we continue to expand our market-partner ecosystem and associated distribution capacity; and we continue to demonstrate technology leadership. I believe that we are increasingly well-positioned to establish a global market leadership position in enterprise AI software.
>
> * * *
>
> C3 AI significantly expanded its market-partner ecosystem to broaden its distribution and service network globally. In addition to expanding its market partnership activities with Microsoft, Baker Hughes, and ENGIE, C3 AI extended our relationship with Raytheon to serve the defense and intelligence communities; with FIS, a global financial services software company, to serve the banking and financial services industries; and with Infor to serve the global ERP market.

### March 1, 2021 Earnings Call

150.   That same day, on March 1, 2021 C3 held an earnings conference call with

analysts and investors to discuss C3's financial results for the third quarter of the 2021 Fiscal Year (the "Q3 2021 Earnings Call"). During the call, Defendant Siebel stated:

> We continue to expand our market partner ecosystem and the associated increased distribution capacity associated with that. We continue to demonstrate technology leadership. I believe that we are increasingly well positioned to establish a global market leadership position in enterprise AI software. So let's talk about the financial highlights. All in all, it was a strong third quarter. Revenue in the third quarter was $49.1 million. $42.7 million of that was subscription revenue, an increase of 23% from a year earlier.

151.  Also, during the Q&A portion of the Q3 2021 Earnings Call, analyst Brad Sills asked the following question pertaining to C3's partnerships with other companies:

> Oh, great. Hey, thanks guys for taking my question and congratulations on your first quarter as a public company. I wanted to ask about the vertical partner focus here. Obviously, you talked about some leverage that you'll see here from some of these partnerships could you help us understand for perhaps some of the newer ones like Raytheon FIS, these are relatively new verticals for the company. What kind of resources are committed from these partners? How are you going to market together? How are you expected to get that leverage through these partnerships? Thank you so much.

152.  Defendant Siebel responded to Brad Sills' question by stating the following:

> Hey, Brad. I'll fill this one because it's kind of sales to marketing related. Well, as you know, we're going to market across three plains. We have horizontal market partners like say Microsoft would be the largest, but also IBM NVIDIA. We're building a geographic marketing organization in North America, Asia Pacific, okay, and in Europe. And then across all sectors, we have vertical market sales organizations in oil and gas, in utilities, in financial services, in precision health, et cetera. And you can get expect that each of the – the goal is that each of these vertical markets we will align with a leveraged market partner. So the classic case is Baker Hughes. **So we've aligned in oil and gas with Baker Hughes, this is a 24 roughly, I think, billion-dollar oil services company that gives us access to 12,000 people now selling with us around the world. And there's virtually not one of the largest, say 20 or 30 oil companies, that we're not in active sales motion with, whether it's Aramco, ADNOC, Rosneft Gazprom, Shell, and 12,000 salespeople is a lot**

*of sales capacity*.

### Morgan Stanley Virtual Conference

153.   On March 2, 2021, Defendant Abbo spoke at the Morgan Stanley Virtual Conference. During the conference, Defendant Abbo replied to a question asking how C3 chose Baker Hughes as the Company's partner for the energy industry:

> Well, first of all, the software we're talking about really is – requires the main knowledge and domain expertise and obviously, Baker Hughes has extensive domain knowledge in this industry as a leader in oil field services. So it was not it was not difficult to make that selection or Conner, we're not talking about general purpose software like SAP and ERP enterprise resource planning software. We're really talking about software that is deep domain experience and expertise and the AI in ML models are basically capturing the inherent processes and the know-how of the industry to basically improve the operations of that particular industry. ***And so there is no better partner than Baker Hughes. They basically have a long-standing deep relationships with almost all oil and gas companies, independent national companies out there. The collaboration is I would say is very deep if you will. So we're collaborating on product. We're collaborating on the customer engagement to make them successful and Uwem [Ukpong] and I speak on a multiple times on a weekly basis. So it's really a very deep partnership between the two companies. Our objective is to drive digital transformation for large – medium and large oil and gas companies. So that's why we chose Baker Hughes.***

### March 2, 2021 JMP Securities Conference

154.   Also on March 2, 2021, Defendant Siebel spoke at a JMP Securities conference, during which, he stated that "now with Baker Hughes, we have 12,000 salespeople selling for us around the world and into every oil and gas company on the planet, Aramco, ADNOC, Gazprom, Rosneft, Exxon, you name it." Later during the conference, Defendant Siebel was asked about C3's go-to-market strategy and how C3 would work to enlarge the Company's customer base. Defendant Siebel replied:

> Yes, we have a pretty complex go-to-market strategy. So we have horizon, we have geographical organizations, APAC EMEA. Okay and the North American Group, within which we are building a major accounts group, a

enterprise sales group, a middle market group and a mass market group. Then we're building vertical market sales organizations for oil and gas, for utilities for tele-communications, for healthcare, for aerospace and for defense.

Okay. And within each of those, we're building a major accounts group, a strategic accounts group, a middle market group and a mass market group. ***Then associated with each of the verticals we're aligning with a market partner, which gives us market leverage, for example at oil and gas, we go to market with Baker Hughes. That gives us 12,000 people selling for us and allows us to walk immediately into the board room of Aramco. It would take us 10 years to get to the more – [board] room of Aramco, okay, but for Baker Hughes.***

155.   Also, during the JMP Securities Conference, Defendant Siebel stated the following about C3's relationship with Baker Hughes:

I think that Microsoft – I mean, these guys at Microsoft – Now, let's talk a little bit about what's going on with Microsoft today? We are in sales motion, an enterprise sales motion aligned with the Azure people, and SAT, and JP, and (inaudible) and probably 200 accounts around the world, in major account selling were, four legged sales calls and if it's oil and gas, it's a six legged sales call. For example at, Shell, okay, we'll have Baker Hughes, we'll have C3 and we will have Microsoft and we'll bring all of our services. And Shell way quite honestly doesn't know where Microsoft lets off and C3 starts and Baker Hughes picks up, and they don't care. They just know that they have all the services that they need. ***So that we have a similar relationship with them in CRM. I would say the second most mature partnership that we have Baker Hughes, I think we're seven quarters into that and now we have 12,000 people selling for us at Baker Hughes.***

***May 24, 2021 JP Morgan Global Tech Conference***

156.   On May 24, 2021, Defendant Siebel attended the JP Morgan Global Tech Conference. During the conference, Defendant Siebel reiterated that C3's partnership with Baker Hughes involved "***12,000 people selling C3 for us all around the world every day, 12,000 people***."

***June 25, 2021 Form 10-K***

157.   On June 25, 2021, C3 filed its annual report on Form 10-K with the SEC for the 2021 Fiscal Year (the "2021 10-K"). The 2021 10-K was signed by Defendants Siebel, Barter, House, Levin, McCaffrey, Sastry,  Sewell, nabe, and Ward and contained certifications, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") and signed by Defendants Barter and Siebel, attesting to the accuracy of the financial statements contained in the 2021 10- K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2021 10-K stated the following regarding C3's strategic partnership with Baker Hughes, in relevant part:

> Baker Hughes: Oil, Gas, and Chemicals. In 2019, we a formed a strategic alliance with Baker Hughes, a $24 billion oil and gas services company. Under the terms of this alliance, Baker Hughes has standardized on C3 AI for all internal use AI applications. ***In addition, we are jointly marketing and selling a range of Enterprise AI solutions to address the entire value of upstream, mid-stream, and downstream activity under the BHC3 brand to oil and gas companies globally with the active engagement of Baker Hughes, which has a 12,000-person sales organization.***

### *August 12, 2021 Canaccord Genuity 41st Annual Growth Conference*

158.   On August 12, 2021, Defendant Siebel attended the Canaccord Genuity 41st Annual Growth Conference. During the conference, Defendant Siebel stated the following C3's strategic partnership with Baker Hughes:

> We're forming major account groups, enterprise sales groups, middle market groups and then mass market groups in each vertical market where we've been building out very significant market partners, who distribute these products with us for example in oil and gas at Baker Hughes. ***And Baker Hughes has 12,000 people selling with us around the world in oil and gas market, and since then we've penetrated Baker Hughes***, Shell, Coke, MEG, LyondellBasell, Georgia – Flint Hills Research.

### *August 20, 2021 Proxy Statement*

159.   On August 20, 2021, the Company filed a proxy statement on Schedule 14A with the SEC (the "2021 Proxy Statement"). The Defendants House, Sastry, Siebel, Levin, Sewell, Simonelli, McCaffrey, Snabe, and Ward solicited the 2021 Proxy Statement, which contained material misstatements and omissions.

160.   The Proxy Statement announced a forthcoming annual meeting of shareholders on October 6, 2021 and asked C3 shareholders to: (1) re-elect Defendants House, Sastry, and Siebel to the Board; and (2) ratify the appointment of Deloitte & Touche LLP as C3's independent registered public accounting firm for the 2022 Fiscal Year.

161.   The 2021 Proxy Statement stated the following regarding the Board's risk oversight functions:

> Risk is inherent with every business, and we face a number of risks, including strategic, financial, business and operational, cyber security, legal and compliance, and reputational. We have designed and implemented processes to manage risk in our operations. Management is responsible for the day-to-day management of risks we face, while our board of directors, as a whole and assisted by its committees, has responsibility for the oversight of risk management. In its risk oversight role, our board of directors has the responsibility to satisfy itself that the risk management processes designed and implemented by management are appropriate and functioning as designed.

> While our board of directors is ultimately responsible for risk oversight, our board committees assist our board of directors in fulfilling its oversight responsibilities in certain areas of risk. Our audit committee assists our board of directors in fulfilling its oversight responsibilities with respect to risk management in our major financial risk exposures and the areas of internal control over financial reporting and disclosure controls and procedures. Our nominating and corporate governance committee assists our board of directors in fulfilling its oversight responsibilities with respect to risk management associated with board organization, membership and structure, and corporate governance. Our compensation committee assesses risks created by the incentives inherent in our compensation policies and practices. Our board of directors appreciates the evolving nature of our business and industry and is actively involved with monitoring new threats and risks as they emerge.

Our board of directors believes that open communication with management is essential for effective risk management and oversight. Our board of directors meets with our Chief Executive Officer and other members of our senior management team at quarterly meetings of our board of directors, where, among other topics, management reports to and seeks guidance from our board of directors and its committees with respect to the most significant risks that could affect our business, such as legal risks, information security, cyber security, and privacy risks, and financial, tax, and compliance related risks. In addition, among other matters, management provides our audit committee periodic reports on our compliance programs and investment policy and practices.

162. The 2021 Proxy Statement also listed certain responsibilities of the Company's Audit Committee, which consisted of Defendants Levin, McCaffrey, and Simonelli at the time. The 2021 Proxy Statement provided as follows:

The primary purpose of the audit committee is to discharge the responsibilities of our board of directors with respect to our corporate accounting and financial reporting processes, systems of internal control and financial statement audits, and to oversee our independent registered public accounting firm. Specific responsibilities of our audit committee include:

•helping our board of directors oversee our corporate accounting and financial reporting processes;

•managing the selection, engagement, qualifications, independence, and performance of a qualified firm to serve as the independent registered public accounting firm to audit our financial statements;

•discussing the scope and results of the audit with the independent registered public accounting firm, and reviewing, with management and the independent accountants, our interim and year-end operating results;

•developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;

•reviewing and approving related person transactions;

•obtaining and reviewing a report by the independent registered public accounting firm at least annually that describes our internal quality control procedures, any material issues with such procedures and any steps taken to deal with such issues when required by applicable law; and

•approving or, as permitted, pre-approving, audit and permissible non-audit services to be performed by the independent registered public accounting firm.

163.   The 2021 Proxy Statement also provided the following regarding the Company's Corporate Governance Guidelines and the C3 Code:

> Our board of directors has adopted corporate governance guidelines that address items such as the qualifications and responsibilities of our directors and director candidates and corporate governance policies and standards applicable to us in general. In addition, our board of directors has adopted a code of business conduct and ethics that applies to all of our employees, officers, and directors, including our Chief Executive Officer, Chief Financial Officer, and other executive and senior financial officers. The full text of our corporate governance guidelines and our code of business conduct and ethics is posted on the Governance section of our investor relations website ir.c3.ai. We intend to post on our website all disclosures that are required by law or NYSE listing standards concerning any amendments to, or waivers from, any provision of the code.

164.   The statements referenced in ¶¶ 161-163 were false and misleading because, given C3's undisclosed issues, which the Individual Defendants knew or should have known, it was unreasonable to state that the Company's Board and Audit Committee would exercise and were exercising risk oversight and review accounting practices as well as review accounting and disclosure controls.

165.   In addition, the 2021 Proxy Statement was materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading, because the 2021 Proxy Statement failed to disclose, *inter alia*, that: (1) C3's Baker Hughes partnership was falling apart; (2) C3 experiencing largescale turnover in its salesforce; (3) C3's total addressable market (TAM) figures, market growth projections, and relationships with major businesses were patently unrealistic and unattainable; and (4) C3 failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

166.   As a result of the material misstatements and omissions contained in the 2021

Proxy Statement, Company shareholders re-elected Defendants House, Sastry, and Siebel to the Board, who had breached their fiduciary duties to the Company, allowing them to continue to breach their fiduciary duties to C3.

### September 1, 2021 Form 10-Q

167.  On September 1, 2021, the Company filed its quarterly report with the SEC for the first quarter of the 2022 Fiscal Year (the "1Q22 10-Q") with the SEC. The 1Q22 10-Q which was signed by Defendants Siebel and Barter and contained SOX certifications signed by Defendants Siebel and Barter attesting to the accuracy of the financial statements contained in the 1Q22 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 1Q22 10-Q boasted about C3's "field sales organization" and the Company's "strategic go-to-market alliances," including its "notable" partnership with Baker Hughes:

> *In addition to the activities of our field sales organization*, our success in attracting new customers will depend on our ability to expand our ecosystem of strategic partners and the number of industry verticals that they serve. *Our strategic go-to-market alliances vastly extend our reach globally. Some of our most notable partners include Baker Hughes…* Each strategic partner is a leader in its industry, with a substantial installed customer base and extensive marketing, sales, and services resources that we can leverage to engage and serve customers anywhere in the world. Using our C3 AI Suite as the development suite, we leverage our model-driven architecture to efficiently build new cross-industry and industry-specific applications based on identifying requirements across our customer base of industry leaders and through our industry partners. Our strategy with strategic partners is to establish a significant use case and prove the value of our C3 AI Suite with a flagship customer in each industry in which we participate. We have done this with our strategic vertical industry partner in oil and gas, Baker Hughes, as well as with our iconic global customers, some of whom are deploying C3 AI technology to optimize thousands of critical assets globally across their upstream, midstream, and downstream operations. We establish formal sales and marketing plans with each partner, including specific sales goals and dedicated budgets, and we work closely with these partners to identify specific target accounts.

1

2

### *September 10, 2021 Deutsche Bank Tech Conference*

168.   On September 10, 2021, Defendant Siebel attended the Deutsche Bank Tech Conference. During the conference, Patrick Colville interviewed Defendant Siebel. During the interview, Colville asked Defendant Siebel the following question regarding C3's partnership with Baker Hughes:

> Okay. Yes. And I guess, I mean, a key partner both historically and going forward, it's been Baker Hughes. C3 has got an amazingly close partnership with them and my conscience is they can use C3 software both internally in their environment and resells the software. Can you just help us understand that partnership and just kind of help us understand how's it kind of doing in a moment?

169.   Defendant Siebel responded by stating the following about C3 and Baker Hughes:

> Yes. Baker Hughes, we entered into a strategic partnership with them some years ago. They do use the application for some internal applications, like inventory optimization and what have you, and we go to market with them globally. ***So we have go-to-market motion with them at virtually every major order of 12,000 people working with us in all divisions of Baker Hughes and we have sales marketing activities going on in virtually every oil and gas company in the world and they're in various stages of early stages, running pilots, in some cases, running production applications in places like Shell***, LyondellBasell, and Koch, but that's a strategic partnership and it's extraordinary positive.

### *September 13, 2021 Piper Sandler 2021 Global Tech Conference*

170.   On September 13, 2021, Defendant Siebel attended the Piper Sandler 2021 Global Tech Conference. During the conference, analyst Arvind Ramnani asked Defendant Siebel the following question regarding C3's partnership with Baker Hughes:

> Terrific, terrific. And I think your go-to-market approach is also very unique, right. I mean, it's -- kind of building AI company is difficult, but also some of the approach you've taken is I think quite different. Looking to have really

leveraged partners such as Baker Hughes, FIS in specific verticals, what is the rationale for partnering with these vertical leaders versus sort of really going after the market by yourself?

171.    Defendant Siebel responded by stating the following about C3 and Baker Hughes:

Well, it gives us market leverage, I mean, we're 700 people. ***I have 12,000 people selling for me at Baker Hughes into oil and gas***. At FIS, I have thousands of people selling with me into the financial services and banking market. I saw with Microsoft across a wide range of markets.

***November 29, 2021 KeyBanc Summit***

172.    On November 29, 2021, Defendant Siebel attended the KeyBanc Summit. During the Summit, Michael Turtis, during an interview, asked Defendant Siebel the following question regarding C3's partnership with Baker Hughes:

So speak of these verticals, I want to switch over to your go-to-market strategy, which is quite powerful and unique in terms of the way that you've entered some of these verticals by partnering with some of the other participants in those vertical industries. So, I talked about Baker Hughes, about Raytheon, FIS, what would you want for the strategy in general? And then I'd like at some point maybe to finish on Microsoft because you've got a formal unannounced partnership there. But let's talk through some of these others as well.

173.    Defendant Siebel responded by stating the following about C3 and Baker Hughes:

Our market, we have a relatively complex go-to-market strategy where we are organized both geographically, vertically and by market partner. So I have geographic coverage for North America, for EMEA and for APAC. Within each of those, I have enterprise sales groups, middle market sales groups and then marketplace sales group, selling the mass audiences. Orthogonal to that we have the vertical market sales organization that we're developing product and fielding sales and service organizations for the oil and gas industry, for the utility industry, for the telecommunications industry, for the financial services industry, what have you. In each of those verticals I am forming

partnerships with a highly leveraged market partner. For example, in oil gas, I go to market with Baker Hughes. ***Baker Hughes is of course one of the largest oil and gas service providers and they have 12,000 people selling with us around the world every day to name the company, be it Rosneft Gazprom, Chevron, whoever it may be***.

174.   Later during the Summit, Defendant Siebel responded to another question pertaining to the size and nature of C3's partnership with Baker Hughes by stating the following:

Well, let's look at the history of Baker Hughes. Baker Hughes, of course, was acquired by GE Oil & Gas. And so the leadership of GE Oil & Gas went over to run Baker Hughes and they took the Predix with them. So, Predix was their digital platform to reach the oil and gas industry. And after some time, they made this decision to switch from Predix to C3 AI for reasons that I'll let you ask them sometime. And the nature of the relationship that we entered into with Baker Hughes, it was a strategic partnership where they took an equity position in C3 that was pretty significant. ***We agreed that we would go to market with no other oil and gas service provider that Baker Hughes would be our sole provider and that they would be marketing our solutions through their 12,000-person sales organization globally***.

175.   The statements referenced in ¶¶ 142-158 and 167-174 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) C3's Baker Hughes partnership was falling apart; (2) C3 experiencing largescale turnover in its salesforce; (3) C3's total addressable market (TAM) figures, market growth projections, and relationships with major businesses were patently unrealistic and unattainable; and (4) C3 failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## **The Truth Begins to Emerge**

### ***December 1, 2021 Press Release***

176.   On December 1, 2021, C3 issued a press release, after market hours, that

revealed C3's financial performance for the second quarter of the 2022 Fiscal Year. The press release revealed that C3's non-GAAP adjusted RPO showed zero growth year-over-year, even when accounting for an incremental $45 million increase in the value of the Baker Hughes contract after the restructuring of C3's joint venture with Baker Hughes.

### December 1, 2021 Conference Call

177.   Later that day, on December 1, 2021, C3 held an earnings conference call with analysts and investors to discuss C3's financial performance for the second quarter of the 2022 Fiscal Year. During the call, Defendant Siebel revealed that C3 initiated a large salesforce restructuring in July 2021 and also initiated another restructuring at the end of the second quarter of 2021:

> Now historically C3 AI has relied upon a high-touch, white glove service strategic selling model to acquire and obtain customers. In July of 2021, in an attempt to further accelerate revenue scalability and customer adoption, we reorganized sales as an independent unit along traditional hierarchically regimented selling structures like those in place at SAP and IBM. That proved to be a mistake.

> While the revenue came in the quarter was strong, the overall performance of the sales organization and specifically new sales activity in the second quarter was unacceptable. The management team and I have spent the past month restructuring the global sales function, molded in the traditional model that we know to be effective, as a high-touch, classic, strategic selling machine. That process is now complete and the early indicators are quite positive. Our customer has increased. Our sales visibility has increased and the amount of revenue of Q3 revenue that we have closed as of the end of November, gives us very high confidence levels in our Q3 revenue forecast.

178.   Also, during the call, Defendant Siebel revealed that C3 did not enjoy full access to Baker Hughes' 12,000-person salesforce and that, contrary to the Individual Defendants' representations, Baker Hughes made an entirely separate sales division that was not as established nor as well-connected as the real Baker Hughes salesforce. Defendant Siebel revealed, in relevant part:

*The real motivation behind restructuring Baker Hughes was to basically kind of realign the sales structure.* So Baker Hughes is, I think roughly $28 billion business and they run four central business units and, you know the real relationship with Baker Hughes has to the deep, deep industry expertise in oil and gas, process industries and kind of manifest -- chemicals, petrochemical business and they are kind of the masters in the universe of that and they have these unbelievably close relationships going back, now I think 70 years with everybody in the world from Rosneft to Gazprom to Aramco to Shell, Chevron, you name it, okay.

And those relationship and that expertise are in their four business units. *When we first put together the relationship with Baker -- with C3 AI-Baker Hughes, they basically formed a new business unit that was called Baker Hughes C3[]. That sat outside of those organization. And so they really weren't the people with the relationships and they weren't the people with the quotas and they weren't the people with the deep industry expertise and what really did here was as we restructured it in a way, that we put all the sale resources end of the quota in operating units of Baker Hughes. Okay?*

179.    On this news, the price of the Company's common stock fell $3.79 per share, or approximately 11.20%, from its closing price of $33.83 per share on December 2, 2021, to close at $30.04 per share on December 3, 2021.

180.    However, also during the December 1, 2021 earnings conference call, the Individual Defendants continued to make materially false and misleading statements. The Individual Defendants stated that the third amendment to the Baker Hughes joint venture was a positive development for the Company because it increased total revenue commitments to C3.

### December 2, 2021 Virtual Wells Fargo TMT Summit

181.    On December 2, 2021, Defendant Siebel attended the annual Virtual Wells Fargo TMT Summit. During the Summit, Defendant Siebel stated the following: "If we look at the analysts' predictions for the size of the enterprise AI software market, *this promises to be on the order of a $300 billion software market in, say, 2025*."

182.    The statements referenced in ¶¶ 180-181 herein were materially false and

misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) C3's Baker Hughes partnership was falling apart; (2) C3 experiencing largescale turnover in its salesforce; (3) C3's total addressable market (TAM) figures, market growth projections, and relationships with major businesses were patently unrealistic and unattainable; and (4) C3 failed to maintain internal controls.

## The Truth Emerges

183.   The truth fully emerged on February 16, 2022, when Spruce Point issued the Spruce Point Report, urging investors of C3 to sell their holdings. The Spruce Point Report revealed that C3's thrice restructured partnership with Baker Hughes, C3's largest customer by sales (constituting about thirty percent of all C3 sales in the 2021 Fiscal Year), supported the Company's sales through minimum guarantees.

184.   However, a former C3 employee depicted the partnership as "a marriage that is not working." For instance, when the joint venture agreement between the Company and Baker Hughes was amended for the third time on October 31, 2021, the remaining minimum revenue commitment for the 2022 Fiscal Year was removed and Baker Hughes' peak revenue commitment was reduced and delayed until the 2025 fiscal year. The third amendment also featured other difficult provisions for the Company, including price discounts to prospective customers.

185.   Further, the Spruce Point Report questioned whether the partnership between Baker Hughes and C3 would continue after the current agreement ended. The Spruce Point Report also revealed that C3 was paying Baker Hughes $25 million in sales commissions on what Spruce Point determined to be a maximum of $11 million of eligible revenues for commission payments. Making matters worse, the Company agreed to pay the lucrative commissions despite the Baker Hughes joint venture not being on track to hit the minimum revenue requirement for the 2022 Fiscal Year.

186.   Additionally, the Spruce Point Report revealed that, contrary to the Individual

Defendants' statements during the December 1, 2021 earnings conference call, the third amendment to the joint venture between C3 and Baker Hughes would reduce the net cash commitments made to C3 from Baker Hughes. The Spruce Point Report also revealed that other highly-touted partnerships with companies like Google, Microsoft, AWS, and Intel either were not as significant as C3 had represented or had not expanded to the level C3 had stated publicly. For instance, sales agents from Hewlett Packard and Microsoft were not familiar with C3's name and did not attempt to sell Spruce Point employees any C3 products or services. Additionally, despite C3's representations about its "strategic alliance with Google Cloud," Spruce Point revealed that C3 was not even mentioned as a "Featured Partner Solution" on Google Cloud's AI and machine learning website.

187.   The Spruce Point Report also revealed that, during the IPO process, C3 materially inflated its TAM from $170 billion to $271 billion. In the Offering Documents, C3 stated that C3's market would grow to $271 billion by 2024. In C3's September 2020 prospectus, however, just two months before the IPO, C3 represented that the Company catered to "a large and rapidly growing market, estimated to be $106 billion in 2020, growing to $170 billion in 2024."

188.   Lastly, the Spruce Point Report revealed the Company suffered from significant turnover issues, involving employees from the sales teams all the way to the CFO. The Spruce Point Report stressed that C3 had three CFOs at the Company since the start of the Company's IPO process in September 2020. Specifically, the Spruce Report emphasized that Defendant Barter resigned after just 14 months with C3, forfeiting more than 900,000 unvested options—a package worth about $20 million. The Spruce Report noted that a former C3 employee stated they had four different bosses in six months, stating that "attrition is a real problem."

189.   On this news, the Company's stock price fell $1.01 per share, or 3.9%, from its closing price of $25.71 per share on February 15, 2021 to close at $24.70 per share on February 16, 2022.

## DAMAGES TO C3

190.   As a direct and proximate result of the Individual Defendants' misconduct, C3 has lost and will continue to lose and expend many millions of dollars.

191.   Such expenditures include, but are not limited to, any internal investigations, legal advisory, and other professional service fees incurred in defending any investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

192.   Such expenditures include expenses associated with the Company's failure to maintain internal controls and the failure to file accurate reports with the SEC.

193.   Additionally, these expenditures include, but are not limited to, lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

194.   As a direct and proximate result of the Individual Defendants' conduct, C3 has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

195.   Plaintiffs bring this action derivatively and for the benefit of C3 to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors and/or officers of C3, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and the aiding and abetting thereof.

196.   C3 is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

197.   Plaintiff is, and has been at all relevant times, a shareholder of C3. Plaintiff will adequately and fairly represent the interests of C3 in enforcing and prosecuting his rights, and, to that end, has retained competent counsel, experienced in derivative litigation,

to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

198.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

199.   A pre-suit demand on the Board of C3 is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Siebel, Levin, McCaffery, Sewell, Snabe, Ward (the "Director-Defendants") and non-parties Lisa Davis, KR Sridhar and Director Rice (collectively with the Director-Defendants, the "Directors"). Plaintiffs need only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

200.   Demand is excused as to all of the Directors because each one of them is beholden to and controlled by Defendant Siebel. Defendant Siebel, while acting in simultaneous capacities as C3's CEO and as C3's Chairman of the Board, issued many of the false and misleading press releases, participated in nearly all of the conferences and Summit events that featured false and misleading statements, many of which were personally made by him, personally signed the false and misleading 2021 10-K, solicited the false and misleading 2021 Proxy Statement, and agreed to the 90-day exception to the 180-day lockup period for the IPO, which materially benefitted all of the Individual Defendants and non-party director Rice. Further, he facilitated the Individual Defendants' breaches of their fiduciary duties and aided and abetted those breaches of fiduciary duties.

201.   Moreover, Defendant Siebel has majority control over the Company by his ownership of both Class A and Class B stock, giving him 55.5 % of the total voting power of the Company. Accordingly, Defendant Siebel's ability to substantially influence the Board renders the Directors beholden to and controlled by him and thus make the Directors incapable of independently and disinterestedly investigating any misconduct committed by one another who engaged in and materially benefited from the fraudulent misconduct outlined herein.

202.   To date, Director-Defendants Siebel, McCaffrey, Ward, Levin, and Sewell, as well as nonparty Rice, have received material personal benefits from their insider sales as a result of the Individual Defendants' false and misleading statements alleged herein. As a result of the approval of the 90-day exception to the traditional 180-day lockup period for IPOs, Director-Defendant Siebel profited by $600 million during the 2021 Fiscal Year and the 2022 Fiscal Year, Director-Defendant McCaffrey profited by $16.7 million during the 2021 Fiscal Year and the 2022 Fiscal Year, Director-Defendant Ward profited by $15.3 million during the 2021 Fiscal Year and the 2022 Fiscal Year, Director-Defendant Levin profited by $7.9 million during the 2021 Fiscal Year and 2022 Fiscal Year, Director-Defendant Sewell profited by $3.1 million during the 2021 Fiscal Year and 2022 Fiscal Year, and non-party Rice profited by $9.9 million during the 2021 Fiscal Year.

203.   Additional reasons that demand on Defendant Siebel is futile follow. Defendant Siebel founded C3 in 2009 and is the controlling shareholder. Since founding the Company, Defendant Siebel has served as the Company's CEO and Chairman of the Board. As the Company's highest officer and Chairman of the Company, Defendant Siebel bears significant culpability for the issuance of false and misleading statements during the Relevant Period. These include the false and misleading statements in the 2021 Proxy Statement, which he solicited, and the 2021 10-K, which he signed. The false and misleading statements in the 2021 Proxy Statement contributed to Defendant Siebel's re-election to the Board. The Company provides Defendant Siebel with his principal occupation for which he receives handsome compensation—including more than $81 million in just the last three fiscal years. Thus, he cannot disinterestedly consider a demand to sue the directors that control his continued employment, other members of management with whom he worked or still works, and himself. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his

duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Moreover, Defendant Siebel has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made staggering insider sales totaling more than $600 million, which were largely facilitated by the Individual Defendants inserting a unique 90-day exception to the traditional 180-day lockup period following an IPO, and were the product of the Individual Defendants' false and misleading statements alleged herein, and which further makes him unlikely to investigate any misconduct committed by the Individual Defendants in effectuating the 90-day exception to the lock up provision. For these reasons, Defendant Siebel breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

204. Additional reasons that demand on Defendant Levin is futile follow. Defendant Levin has served as a Company director since August 2010. As a trusted Company director, Defendant Levin solicited the false and misleading 2021 Proxy Statement and signed the false and misleading 2021 10-K. The false and misleading statements in the 2021 Proxy Statement contributed to Defendant Siebel's, Defendant House's, and Defendant Sastry's re-election to the Board, allowing them to continue breaching their fiduciary duties to the Company. The Company provides Defendant Levin with handsome compensation—including more than $1 million in just the last three fiscal years. Thus, he cannot disinterestedly consider a demand to sue the Director-Defendants. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Moreover, Defendant Levin has materially benefitted from the Individual Defendants'

breaches of fiduciary duty alleged herein, having made staggering insider sales totaling more than $7.9 million, which were largely facilitated by the Individual Defendants inserting a unique 90-day exception to the traditional 180-day lockup period following an IPO, and were the product of the Individual Defendants' false and misleading statements alleged herein, and which further makes him unlikely to investigate any misconduct committed by the Individual Defendants in effectuating the 90-day exception to the lock up provision. For these reasons, Defendant Levin breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

205.   Additional reasons that demand on Defendant McCaffrey is futile follow. Defendant McCaffrey has served as the Company's Lead Independent Director since March 2009. As a trusted Company director, Defendant McCaffrey solicited the false and misleading 2021 Proxy Statement and signed the false and misleading 2021 10-K. The false and misleading statements in the 2021 Proxy Statement contributed to Defendant Siebel's, Defendant House's, and Defendant Sastry's re-election to the Board, allowing them to continue breaching their fiduciary duties to the Company. The Company provides Defendant McCaffrey with handsome compensation—including more than $1.5 million in just the last three fiscal years. Thus, he cannot disinterestedly consider a demand to sue the Director-Defendants. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Moreover, Defendant McCaffrey has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made staggering insider sales totaling more than $16.7 million, which were largely facilitated by the Individual Defendants inserting a unique 90-day exception to the traditional 180-day

lockup period following an IPO, and were the product of the Individual Defendants' false and misleading statements alleged herein, and which further makes him unlikely to investigate any misconduct committed by the Individual Defendants in effectuating the 90-day exception to the lock up provision. For these reasons, Defendant McCaffrey breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

206.   Additional reasons that demand on Defendant Sewell is futile follow. Defendant Sewell has served as a Company Director since May 2017. As a trusted Company director, Defendant Sewell solicited the false and misleading 2021 Proxy Statement and signed the false and misleading 2021 10-K. The false and misleading statements in the 2021 Proxy Statement contributed to Defendant Siebel's, Defendant House's, and Defendant Sastry's re-election to the Board, allowing them to continue breaching their fiduciary duties to the Company. The Company provides Defendant Sewell with handsome compensation—including more than $1.5 million in just the last three fiscal years. Thus, he cannot disinterestedly consider a demand to sue the Director-Defendants. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Moreover, Defendant Sewell has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made staggering insider sales totaling more than $3.1 million, which were largely facilitated by the Individual Defendants inserting a unique 90-day exception to the traditional 180-day lockup period following an IPO, and were the product of the Individual Defendants' false and misleading statements alleged herein, and which further makes him unlikely to investigate any misconduct committed by the Individual Defendants in effectuating the 90-day exception to the lock

up provision. For these reasons, Defendant Sewell breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

207. Additional reasons that demand on Defendant Snabe is futile follow. Defendant Snabe has served as a Company Director since February 2021. As a trusted Company director, Defendant Snabe solicited the false and misleading 2021 Proxy Statement and signed the false and misleading 2021 10-K. The false and misleading statements in the 2021 Proxy Statement contributed to Defendant Siebel's, Defendant House's, and Defendant Sastry's re-election to the Board, allowing them to continue breaching their fiduciary duties to the Company. The Company provides Defendant Snabe with handsome compensation—including more than $4 million in just the last three fiscal years. Thus, he cannot disinterestedly consider a demand to sue the Director-Defendants. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Snabe breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

208. Additional reasons that demand on Defendant Ward is futile follow. Defendant Ward has served as a Company Director since January 2009. As a trusted Company director, Defendant Ward solicited the false and misleading 2021 Proxy Statement and signed the false and misleading 2021 10-K. The false and misleading statements in the 2021 Proxy Statement contributed to Defendant Siebel's, Defendant House's, and Defendant Sastry's re-election to the Board, allowing them to continue breaching their fiduciary duties to the Company. The Company provides Defendant Ward

with handsome compensation—including more than $4 million in just the last three fiscal years. Thus, he cannot disinterestedly consider a demand to sue the Director-Defendants. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Moreover, Defendant Ward has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made staggering insider sales totaling more than $15.3 million, which were largely facilitated by the Individual Defendants inserting a unique 90-day exception to the traditional 180-day lockup period following an IPO, and were the product of the Individual Defendants' false and misleading statements alleged herein, and which further makes him unlikely to investigate any misconduct committed by the Individual Defendants in effectuating the 90-day exception to the lock up provision. For these reasons, Defendant Ward breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

209.   C3 has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for C3 any part of the damages C3 suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

210.   The acts complained of herein constitute violations of fiduciary duties owed by C3's officers and directors, and these acts are incapable of ratification.

211.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with

corporate funds, i.e., monies belonging to the shareholders of C3. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of C3, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

212.   If there is no directors' and officers' liability insurance, then the Directors will not cause C3 to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

213.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

214.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

215.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of C3's business and affairs.

216.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

217.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their

fiduciary duties to protect the rights and interests of C3.

218.   In breach of their fiduciary duties owed to C3, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) C3's Baker Hughes partnership was falling apart; (2) C3 experiencing largescale turnover in its salesforce; (3) C3's total addressable market (TAM) figures, market growth projections, and relationships with major businesses were patently unrealistic and unattainable; and (4) C3 failed to maintain internal controls.

219.   As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

220.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

221.   Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

222.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of C3's securities.

223.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the

Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of C3's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

224.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

225.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, C3 has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

226.   Plaintiff, on behalf of C3, has no adequate remedy at law.

## SECOND CLAIM
### Against Individual Defendants for Unjust Enrichment

227.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

228.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, C3.

229.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from C3 that was tied to the performance or artificially inflated valuation of C3, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

230.   Plaintiff, as a shareholder and representative of C3, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, payments to the Individual Defendants, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

231.   Plaintiff, on behalf of C3, has no adequate remedy at law.

### THIRD CLAIM
### Against Individual Defendants for Abuse of Control

232.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

233.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence C3, for which they are legally responsible.

234.   As a direct and proximate result of the Individual Defendants' abuse of control, C3 has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

235.   Plaintiff, on behalf of C3, has no adequate remedy at law.

### FOURTH CLAIM
### Against Individual Defendants for Gross Mismanagement

236.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

237.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of C3 in a manner consistent with the operations of a publicly-held corporation.

238.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, C3 has sustained and will continue to sustain significant damages.

239.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

240.   Plaintiff, on behalf of C3, has no adequate remedy at law.

## FIFTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

241.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

242.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees to the detriment of the shareholders and the Company.

243.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused C3 to waste valuable corporate assets while C3 suffered from undisclosed issues. The Individual Defendants' misconduct has caused the Company to incur many millions of dollars of legal liability and/or costs to defend unlawful actions and investigations and the Securities Class Action, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

244.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

245.   Plaintiff, on behalf of C3, has no adequate remedy at law.

## SIXTH CLAIM
### Against Defendants Siebel, Barter, House, Levin, McCaffery, Sastry, Sewell, Simonelli, and Ward for Contribution Under Sections 10(b) and 21D of the Exchange Act

246.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

247.   C3 and Defendants Siebel, Barter, House, Levin, McCaffery, Sastry, Sewell, Simonelli, and Ward are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the

Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Siebel, Barter, House, Levin, McCaffery, Sastry, Sewell, Simonelli, and Ward's willful and/or reckless violations of their obligations as officers and/or directors of C3.

248. Defendants Siebel, Barter, House, Levin, McCaffery, Sastry, Sewell, Simonelli, and Ward, because of their positions of control and authority as officers and/or directors of C3, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of C3, including the wrongful acts complained of herein and in the Securities Class Action.

249. Accordingly, Defendants Siebel, Barter, House, Levin, McCaffery, Sastry, Sewell, Simonelli, and Ward are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

250. As such, C3 is entitled to receive all appropriate contribution or indemnification from Defendants Siebel, Barter, House, Levin, McCaffery, Sastry, Sewell, Simonelli, and Ward.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of C3, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to C3;

(c) Determining and awarding to C3 the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and

severally, together with pre-judgment and post-judgment interest thereon;

       (d)    Directing C3 and the Individual Defendants to take all necessary actions to reform and improve C3's corporate governance and internal procedures to comply with applicable laws and to protect C3 and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

            1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

            2. a provision to permit the shareholders of C3 to nominate at least three candidates for election to the Board;

            3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

       (e)    Awarding C3 restitution from Individual Defendants, and each of them;

       (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

       (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: March 26, 2024           Respectfully submitted,
                      **THE BROWN LAW FIRM, P.C.**

                      */s/Robert C. Moest*

Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
              eitank@bgandg.com

*Attorneys for Plaintiff*

## <u>VERIFICATION</u>

 I, Justin Lanfair, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

 I declare under penalty of perjury that the foregoing is true and correct.  Executed this <u>26</u> day of March, 2024.

_____
Justin Lanfair